J-S33044-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: D.M.M., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: A.S.E., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1680 EDA 2025 |

Appeal from the Decree Entered June 17, 2025
In the Court of Common Pleas of Northampton County Orphans' Court at
No(s):  2024-0020

BEFORE:  BOWES, J., NICHOLS, J., and BECK, J.

MEMORANDUM BY BECK, J.:           **FILED OCTOBER 28, 2025**

A.S.E. ("Mother") appeals from the decree entered by the Northampton County Orphans' Court ("orphans' court") granting the petition filed by the Northampton County Children, Youth, and Families Division ("Agency") to terminate her parental rights to D.M.M. ("Child"), born in February 2022, pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b) of the Adoption Act.[1]  We affirm.

Mother was sixteen years old and Father was eighteen years old when Child was born.  Mother and Father did not work and lived with Mother's mother, C.S. ("Maternal Grandmother").  Just prior to a scheduled doctor's appointment on March 21, 2022, Father admitted to Mother and Maternal

_____

[1]  R.J.M. ("Father") voluntarily relinquished his parental rights to Child.  He did not file an appeal.

Grandmother that he had dropped Child on the wood floor. Mother took Child to the scheduled appointment and informed the doctor that Father had dropped Child. The doctor explained that Father's explanation was implausible based on the multiple, visible injuries sustained by Child. The doctor directed Mother to take Child to the emergency room. At the hospital, imaging tests demonstrated that Child had multiple fractures and bleeding in his brain. Based upon Child's injuries, the Agency received a child protective services referral. Child was taken to Children's Hospital of Philadelphia ("CHOP") and admitted to the pediatric intensive care unit for treatment of his brain injury.

On March 22, 2022, Mother, Father, and Maternal Grandmother executed a safety plan wherein the Agency would direct all contact with Child, and Mother and Father executed a voluntary placement agreement with the Agency to place Child in its care. The Bethlehem State Police initiated a criminal investigation into Child's injuries. Father admitted to intentionally dropping Child, hitting Child's head against the wall, and throwing Child down the stairs. As a result, the Commonwealth charged Father with multiple crimes. Eventually, Father entered a guilty plea to three counts of aggravated assault, and the trial court sentenced him to fifteen to thirty years in prison on March 29, 2023.

In the interim, CHOP discharged Child on April 5, 2022, and the Agency placed him in a medically fragile foster home with J.S. and J.S. ("Foster

Parents"). Child was later diagnosed with cerebral palsy and developmental delays.

The Agency filed a petition for adjudication of delinquency seeking the removal of Child from Mother's care. After an uncontested hearing, the hearing officer recommended granting the petition. The orphans' court confirmed the recommendation and adjudicated Child dependent. On April 21, 2022, the orphans' court issued a permanency plan for Mother, directing her to participate and complete a protective parenting evaluation, cooperate with random drug screenings, complete parenting education and life skills training, and maintain stable income and housing for at least six months.

Mother made minimal progress toward alleviating the circumstances that led to Child's placement. The Agency also had concerns about Maternal Grandmother's home, where Mother lived, and Mother's continued contact with Father. Mother completed a drug and alcohol evaluation and participated in supervised visits with Child. During these visits, Mother was unable to care for Child independently, but could follow directions in caring for Child.

In July 2023, there was an explosion of the septic system at Maternal Grandmother's home, resulting in flooding and water damage and rendering the home inhabitable. Mother and Maternal Grandmother moved into a rental property. During this time, Mother had supervised visits at the rental home and unsupervised visits at the Agency. The unsupervised visits ceased after Mother gave Child candy and deflated balloons, both of which were choking

hazards. Mother also failed to complete school, having failed ninth grade multiple times. The trial court found, however, that Mother made substantial compliance with her permanency plan and moderate progress toward alleviating the circumstances leading to the placement. Nevertheless, the Agency continued to have concerns about Mother's ability to parent, and Child remained with Foster Parents throughout the dependency.

On April 22, 2024, the Agency filed a petition to terminate Mother's and Father's parental rights. The matter proceeded to a hearing on November 4, 2024.[2] Father voluntarily relinquished his parental rights and the hearing proceeded on the petition to terminate Mother's parental rights. Following the hearing, the orphans' court terminated Mother's parental rights. Mother filed a timely appeal and a concise statement of matters complained on appeal pursuant to Pa.R.A.P. 1925.

Mother presents the following claims for our review:

---

[2] Henry R. Newton, Esquire, was the guardian ad litem assigned to represent Child, who was just over two-and-a-half years old at the proceedings. N.T., 11/4/2024, at 5. "[W]here an orphans' court has appointed a [guardian ad litem]/[c]ounsel to represent both the child's best interests and legal interests, appellate courts should review sua sponte whether the orphans' court made a determination that those interests did not conflict." *In re Adoption of K.M.G.*, 240 A.3d 1218, 1235 (Pa. 2020). Because Child was still a baby at the time of these proceedings, there is no error in this regard. *See In re T.S.*, 192 A.3d 1080, 1092 (Pa. 2018) ( "if the preferred outcome of a child is incapable of ascertainment because the child is very young and pre-verbal, there can be no conflict between the child's legal interests and his or her best interests; as such, the mandate of Section 2313(a) . . . is satisfied where the court has appointed an attorney-guardian ad litem who represents the child's best interests during such proceedings").

- 4 -

A. Whether the [orphans'] court erred in finding that [Mother had] a settled p[ur]pose of relinquishing her parental claim to [Child] or failed to perform her parental duties without a[d]equate explanation for her conduct[?]

B. Whether the [orphans'] court erred in finding that Mother caused [Child] to be without essential parental care, control, or subsistence necessary for [Child's] physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect, or refusal cannot or will not be remedied by Mother[?]

C. Whether the [orphans'] court erred in finding that [Child] has been removed from mother for a period of at least six months, and the conditions which led to the removal or placement of [Child] continue to exist, and mother cannot or will not remedy those conditions with a reasonable period of time, and termination of her parental rights best serves the needs and welfare of the child[?]

D. Whether the [orphans'] court erred in finding that [Child] had been removed from mother for a period of at least twelve m[o]nths, and the conditions which led to the removal or placement of [Child] continue to exist, and mother cannot or will not remedy those conditions within a reasonable period of time, and termination of parental rights best serves the needs and welfare of [Child?]

E. Whether the [orphans'] court erred in finding that termination of Mother's parental rights will meet the needs and welfare of [Child?]

Mother's Brief at 3 (some capitalization omitted).

In reviewing an appeal from an order terminating parental rights, we adhere to the following standard:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. This standard of review corresponds to the standard employed in dependency cases, and requires appellate courts to accept the findings of fact and credibility determinations of the [orphans'] court if they are supported by the record, but it does

- 5 -

not require the appellate court to accept the [orphans'] court's inferences or conclusions of law. That is, if the factual findings are supported, we must determine whether the [orphans'] court made an error of law or abused its discretion. An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion; we reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will. Thus, absent an abuse of discretion, an error of law, or insufficient evidentiary support for the [orphans'] court's decision, the decree must stand. We have previously emphasized our deference to [orphans'] courts that often have first-hand observations of the parties spanning multiple hearings. However, we must employ a broad, comprehensive review of the record in order to determine whether the [orphans'] court's decision is supported by competent evidence.

*In re Adoption of C.M.*, 255 A.3d 343, 358-59 (Pa. 2021) (quotation marks, brackets, and citations omitted).

Termination of parental rights is governed by 23 Pa.C.S. § 2511, which requires a bifurcated analysis. *See C.M.*, 255 A.3d at 359. "Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in section 2511(a)." *In re C.M.K.*, 203 A.3d 258, 261-62 (Pa. Super. 2019) (citation omitted). If the orphans' court determines the petitioner established grounds for termination under section 2511(a) by clear and convincing evidence, the court then must assess the petition under subsection 2511(b), which focuses on the child's needs and welfare. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). Clear and convincing evidence is evidence that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without

hesitance, of the truth of the precise facts in issue." ***Matter of Adoption of L.C.J.W.***, 311 A.3d 41, 48-49 (Pa. Super. 2024) (citation omitted).

We therefore begin our assessment under section 2511(a). Because "[t]his Court may affirm the [orphans'] court's decision regarding the termination of parental rights with regard to any one subsection of [s]ection 2511(a)," ***In re J.F.M.***, 71 A.3d 989, 992 (Pa. Super. 2013), we focus our analysis on section 2511(a)(8) of the Adoption Act.

Mother argues that the Agency failed to meet its burden under section 2511(a)(8) because the evidence did not establish that the conditions that led to the initial removal continue to exist and could not be remedied in a reasonable period of time. Mother's Brief at 15-16. She contends that she has made significant efforts to maintain contact with Child since the dependency proceedings commenced and that she has a job, appropriate housing, and no drug issues. ***Id.*** at 15. Mother claims she met all the requirements and participated with all services the Agency recommended. ***Id.*** at 15-16. She asserts she was in Child's life and learned how to deal with his medical issues and states the most recent court summary from April 28, 2025, reflects that her parenting skills had improved and Child engaged with her during these visits. ***Id.*** at 16. Mother also observes that Child's guardian ad litem opposed the Agency's termination petition.[3] ***Id.***

_____

[3] We note with disapproval that Child's guardian ad litem failed to file a brief before this Court.

Section 2511(a)(8) provides for termination of parental rights under the following circumstances:

> The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S. § 2511(a)(8). Thus, to terminate parental rights under section 2511(a)(8), the petitioner must prove: (1) the child has been removed from parental care for 12 months or more; (2) the conditions that led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child. *Id.*; *In re C.L.G.*, 956 A.2d 999, 1008-09 (Pa. Super. 2008) (en banc). Contrary to Mother's contention, this subsection "does not require the court to evaluate a parent's willingness or ability to remedy the conditions that led to the placement of the children." *Interest of M.E.*, 283 A.3d 820, 832 (Pa. Super. 2022). Rather, the "relevant inquiry regarding the second prong of [section] 2511(a)(8) is whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing." *Id.* (quotation marks and citation omitted). Further, "the court shall not consider any efforts by the parent to remedy the conditions described [in section 2511(a)(8)] which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S. § 2511(b); *see also T.S.M.*, 71 A.3d at 255 n.8.

The orphans' court found that the Agency met the first two prongs of section 2511(a)(8):

> At the time of trial, Mother had dropped out of school, having not completed the ninth grade, and had not yet obtained her GED. Mother resides with Maternal Grandmother, who had received an indicated status of child abuse for providing Mother with marijuana as a minor. Mother and Maternal Grandmother also keep a multitude of animals in the home, resulting in several instances of the home being documented as being in an unsanitary condition. [Child's] medical conditions and behavioral impulsivity heighten the safety concerns raised regarding Mother's residence. Further, Mother received more than two and a half years of weekly services to develop her parenting skills and ability to handle [Child's] complex issues. Nonetheless, as stated above, Mother ultimately has not progressed beyond supervised visitation. While we note that Mother was compliant with her attendance, there was no testimony presented to the [c]ourt, that Mother is or imminently [will] be, capable of meeting all of the Child's needs. Here, [Child] has resided, for a period of more than three years, with a foster family capable of meeting his medical and developmental needs and who have been performing all parental duties over that period of time.

Orphans' Court Opinion, 6/17/2025, at 12-13 (citation omitted).[4]

Our review of the record supports the orphans' court's findings as to the first two prongs of subsection (a)(8). The Agency removed Child from Mother's care on March 22, 2022, and Child has remained in kinship care

---

[4] The trial court mistakenly stated here that Mother had not received any unsupervised visitation. As the orphans' court recognized earlier in its decision, however, Mother had "some unsupervised visits at the [A]gency." Orphans' Court Opinion, 6/17/2025, at 6; *see also* N.T., 11/4/2024, at 91, 140-43. "Mother's unsupervised visits were reverted to supervised after she allowed [C]hild to have candy and deflated balloons that posed a choking hazard." Orphans' Court Opinion, 6/172025, at 6; *see also* N.T., 11/4/2024, at 140-43.

throughout the life of this case. N.T., 11/4/2025, at 41. At the time of the filing of the termination petition, in April 2024, Child had therefore been in care for over two years.

In support of the second prong under subsection (a)(8), the record reflects that Child came into care because of injuries suffered at the hands of Father. N.T., 11/4/2025, at 32-41, 57-58. At the hearing, Heather Major ("Major"), an Agency caseworker, testified that upon an investigation into Child's injuries, Father was indicated for causing physical abuse against Child; Mother was indicated as a perpetrator of abuse by omission. *Id.* at 52. Mother also admitted to smoking marijuana since she was thirteen years old, and that Maternal Grandmother provided Mother with the marijuana. *Id.* at 41-42. Major had concerns about the home Mother and Maternal Grandmother shared, stating that there was limited furniture in the home, a strong order of animal feces, and items strewn across the floor. *Id.* at 43.

Sandra Jones ("Jones") testified that she was the Agency caseworker assigned to Mother's case between July 2022 and November 2023. *Id.* at 63, 70. Jones stated the Agency had concerns about the animals in the home, as well as Mother's continued contact with Father, despite the allegations of abuse. *Id.* at 66, 67, 68. She testified that during her time on the case, the condition of Mother and Maternal Grandmother's home did not improve—the litter boxes for the animals were always overflowing with feces. *Id.* at 70-71. Jones stated that she told Mother that she should be concerned about Child's

needs and welfare, not Father's, but Mother did not end things with Father until April 2023. *Id.* at 67, 80-81. Jones indicated that Mother was not attending school and was not completing her classes, noting that Mother was attempting to complete the ninth grade for the third time when she was assigned to the case, and also was not working. *Id.* at 69-70, 83-84. She also testified that Mother would attend medical appointments for Child, but did not know the questions to ask the doctors about Child's condition and continued to need supervision and instruction in caring for Child's special needs, medical condition, and treatment. *Id.* at 72-73, 75, 89. She also observed that Mother would try to get Child's attention over foster mother's, which would cause Child to cry. *Id.* at 72-73. Although Mother had been given repeated instructions during supervised visits with Child, Jones observed that Mother was not learning what was needed to parent Child. *Id.* at 90. Jones acknowledged, however, that Mother complied with services. *Id.* at 75-76, 79-80, 84.

Betsy Genther ("Genther"), a visiting nurse advocate for the county, testified that she worked on three main goals for Mother: "ensuring a safe environment, providing parenting education and support, and ensuring the child's medical needs are being met." *Id.* at 93. Genther noted that during visits, Mother had difficulty engaging and comforting Child. *Id.* at 98. Genther testified that when Mother did not engage with Child, he would cry and ask to go back to his foster home. *Id.* at 99. Although Mother made

some progress during visits in October 2024, Genther confirmed that Mother needed ongoing support to parent Child. *Id.* at 98, 103. Genther discussed Child's medical needs and treatment plans with Mother, but Mother made limited progress regarding Child's medical needs, highlighting that she had only attended a few medical appointments and she was unable to discuss recommendations or ask appropriate questions of doctors. *Id.* at 95-96, 104-05. Genther observed that Mother was more focused on her conflict with foster mother than discussing Child's medical issues with the doctor. *Id.* at 107-08; *see also id.* at 166 (Agency caseworker Jennifer Lorah, who worked on Mother's case after the filing of the termination petition, testified that Mother was unable to attend any doctors' appointments for Child unsupervised because of her contentious relationship with foster mother). She also noted that Mother downplayed Child suffering from cerebral palsy and cannot independently provide for his healthcare needs. *Id.* at 108, 113-14, 135; *see also id.* at 184-85 (Agency caseworker Janel Fortun, who worked on the case following the filing of the termination petition, testified that Mother has a lack of understanding of Child's needs and could not comprehend Child's medical needs).

As the testimony above reflects, although Mother substantially complied with her permanency plan, she has not remedied the conditions that brought Child into care, namely Child's injuries and the ability to care for Child and provide for his medical needs. Mother did not make any progress in

addressing the conditions that brought Child into care for nearly two years. Even assuming that she began making some progress in her parenting post-petition, "a parent's progress toward remedying the conditions is insufficient, as a matter of law, to warrant a finding in favor of the parent under the second prong of subsection (a)(8)." *In re: Adoption of G.W.*, 342 A.3d 68, 87 (Pa. Super. 2025) (en banc) (citation and quotation marks omitted).[5] "By allowing for termination when the conditions that led to removal continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while the parent is unable to perform the actions necessary to assume parenting responsibilities." *In re I.J.*, 972 A.2d 5, 11-12 (Pa. Super. 2009) (citation omitted). Indeed, subsection (a)(8) reflects the General Assembly's refusal to subordinate a "child's need for permanence and stability to a parent's claims of progress and hope for the future" after twelve months has elapsed. *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006).

We therefore conclude that although Mother completed some of her objectives, the record supports the orphans' court's determination that Mother did not remedy the concerns that resulted in Child's removal from her care—

_____

[5] This assumes, of course, that Mother's late progress in addressing her parenting deficits was not based on efforts first initiated after the filing of the termination petition. *See* 23 Pa.C.S. § 2511(b) ("With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition."); *see also In re D.W.*, 856 A.2d 1231, 1234 (Pa. Super. 2004).

her inability to safely parent and care for Child and to provide for his medical needs. *See I.J.*, 972 A.2d at 12 (noting that where the record establishes that all the conditions that led to removal of child had not been remedied and reunification between child and parents was untenable after two years in foster care, the agency met its burden with regard to the second element of section 2511(a)(8)); *see also A.R.*, 311 A.3d at 1112. As such, we conclude that the orphans' court did not err or abuse its discretion in determining that the Agency proved the first two prongs of section 2511(a)(8).

We next consider whether the record supports the orphans' court's conclusion that there was clear and convincing evidence to terminate Mother's rights pursuant to the third prong of subsection (a)(8) and subsection (b).[6]

Section 2511(b) provides:

The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b).

---

[6] Although separately enumerated, this Court has interpreted the needs and welfare analyses required under subsections (a)(8) and (b) to utilize the same legal standards and to be based upon the same evidence. *See G.W.*, 342 A.3d at 89 n.20.

Our analysis focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. *T.S.M.*, 71 A.3d at 267. "[T]he determination of the child's needs and welfare requires consideration of the emotional bonds between the parent and child. The utmost attention should be paid to discerning the effect on the child of permanently severing the parental bond." *Id.* (quotation marks omitted). It is not enough that there exists a bond between parent and child to avoid termination. *Interest of K.T.*, 296 A.3d 1085, 1109 (Pa. 2023). Rather, the family court must determine whether the bond is "necessary and beneficial" to the child, such that "maintaining the bond serves the child's developmental, physical, and emotional needs and welfare." *Id.* at 1105-06. Focusing upon the "child's development, and mental and emotional health," the family court should assess whether severing the bond "is the kind of loss that would predictably cause extreme emotional consequences or significant, irreparable harm" to the child. *Id.* at 1110-11.

Additionally, "the parental bond is but one part of the overall subsection (b) analysis[.]" *Id.* at 1113. The needs and welfare analysis must also include the consideration of factors such as: "the child's need for permanency and length of time in foster care …; whether the child is in a preadoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability." *Id.* (citations omitted).

"These factors and others properly guide the court's analysis of the child's welfare and all [their] developmental, physical, and emotional needs." *Id.* Importantly, "[orphans'] courts have the discretion to place appropriate weight on each factor present in the record before making a decision regarding termination that best serves the child's specific needs." *Id.*

Thus, a court must examine the matter from the child's perspective, placing his or her "developmental, physical, and emotional needs and welfare above concerns for the parent." *Id.* at 1105. "[T]he law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved." *T.S.M.*, 71 A.3d at 268-69. The party seeking termination bears the burden of proving, by clear and convincing evidence, that termination of parental rights serves a child's needs and welfare. *K.T.*, 296 A.3d at 1105.

Mother argues that she has a bond with Child, noting she only missed two visits with Child. Mother's Brief at 17. She claims that her efforts toward reunification and her compliance with the Agency's directives establish termination would not serve Child's developmental, emotional, and physical needs and welfare. *Id.*

The orphans' court determined that termination would best serve the developmental, physical, and emotional needs and welfare of Child:

> [Child] was removed from Mother's care at one month old and has been placed with the same medically fragile foster family since his

release from the hospital. Testimony during the termination trial established Mother has not been involved in the child's day-to-day care for almost the entirety of his life. Although there is certainly an emotional tie between [Child] and Mother, the fact that a child has a bond with a parent does not preclude the termination of parental rights. In addition to evaluating whether the child's bond to the parent is meaningful, the orphans' court can equally emphasize the safety needs of the child, particularly in cases involving … children with special needs. … Although there was testimony that Mother and [Child] are happy to see each other at visits, there was equal testimony that Mother had trouble engaging with [Child] and [Child] did not go to Mother for comfort when upset. There has been no testimony that Mother can adequately or safely manage [Child]'s ongoing health concerns. In the instant matter, the trauma caused by breaking the parent-child bond is outweighed by the benefit of moving the child toward a permanent home. [Child] is bonded to and demonstrates affection toward his foster parents and siblings. The foster family has met his daily developmental, medical, physical, and emotional needs for more than three years. Mother is not immediately ready to take custody [Child] at this juncture, nor is it foreseeable that she will be able to do so soon. Given these circumstances, termination of Mother's parental rights would best serve [Child's] needs and welfare, and free the child for full membership in a family capable of nurturing him, through adoption.

Orphans' Court Opinion, 6/17/2025, at 14-15 (citations and quotation marks omitted).

The record supports the orphans' court conclusion. Barbara Nicole De Salm, a treatment supervisor at Abraxas Youth and Family Services, testified that Child was happy to see Mother during visits. *Id.* at 208. Mother also testified that Child is happy and playful with her on visits. N.T., 11/27/2024, at 10. However, Ericka Gardner ("Gardner"), an Agency caseworker, testified that Child shares a bond with foster parents and that Child is safe and very happy. N.T., 11/4/2024, at 149. Gardner observed that Child is "very close

to foster mom." *Id.*; *see also id.* at 173 (Lorah testifying that Child is close to his foster siblings). Jones stated that foster mother provided all the services needed by Child. *Id.* at 71-72. Lorah indicated that Child would go to foster mom if he was emotionally distraught. *Id.* at 173. Fortun testified that foster parents are "very in tune" with Child in terms of his needs and welfare and that foster mother stays home and works with Child every day on his fine and gross motor skills. *Id.* at 190-91. Foster mother also spends time on education and dealing with Child's behavioral issues by helping him manage and control his outbursts. *Id.*

Based on the record before us and the standard of review we must employ, we discern no abuse of discretion in the orphans' court's conclusion. Although Child is happy to see Mother during his supervised visits, his removal from Mother at five weeks of age and Mother's failure to address Child's ongoing needs cuts against a finding that Child would be irreparably harmed by terminating Mother's parental rights. *See K.T.*, 296 A.3d at 1113. Child is bonded to foster parents and they are dedicated to meeting his needs. *See id.* at 1114. He has complex medical and behavioral concerns that Mother is simply unable to attend to, and he is making great progress in Foster Parents' care. Thus, we conclude that the orphans' court did not err or abuse its discretion in determining that Child's developmental, emotional, and physical needs and welfare are best met by terminating Mother's parental rights, satisfying both the third prong of subsection (a)(8) and subsection (b).

Decree affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/28/2025