In the Matter of J.F.M., A Minor.

Appeal of V.M.

Superior Court of Pennsylvania.

Argued April 16, 2013.

Filed July 10, 2013.

Jonathan W. Crisp, Harrisburg, for appellant.

Marisa K. McClellan, Harrisburg, for Dauphin County Children and Youth, appellee.

Sarah E. Hoffman, Harrisburg, for Guardian Ad Litem, appellee.

BEFORE: FORD ELLIOTT, P.J.E., WECHT and COLVILLE,* JJ.

OPINION BY FORD ELLIOTT, P.J.E.:

Appellant, V.M. ("Mother") appeals from the trial court's August 30, 2012 order that granted the petition to terminate her parental rights to J.F.M. ("Child") filed by the Dauphin County Social Services for Children and Youth ("the Agency") and changed Child's permanency goal to adoption.[1] We affirm.

The Agency began working with Mother in 2006 due to concerns related to her mental health and significant lack of parenting skills. Mother's parental rights to her first child, H.W., were involuntarily terminated on October 24, 2006. On September 11, 2009, Mother voluntarily relinquished her parental rights to her second child, L.M. J.F.M., who is the subject of the instant matter, was born in November of 2009. Once the Agency became aware of Child's birth, and as a result of its concerns over Mother's mental health and ability to provide proper care for Child, the Agency convened a shelter hearing on November 16, 2009. On November 25,

---

* Retired Senior Judge assigned to the Superior Court.

1. Child's biological father's parental rights were terminated on November 2, 2011. Father has not appealed that decision.

2009, an adjudication and disposition hearing was held wherein the Agency requested and was granted aggravated circumstances such that they were not required to pursue reasonable efforts towards reunification.

At the adjudication and disposition hearing, the trial court established the following family service plan ("FSP") objectives for Mother for the purposes of facilitating reunification:

1. Follow through with mental health treatment and medication management;

2. Demonstrate appropriate parenting skills and interaction with J.F.M.;

3. Attend all court hearings, Agency meetings and treatment plan meetings;

4. Notify the Agency within 24 hours of a new residence;

5. Maintain appropriate, safe and stable housing;

6. Maintain visitation with [Child];

7. Stay in contact with the Agency;

8. Sign all release of information forms requested by the Agency;

9. Reimburse the County for support of any children in placement.[Footnote 2]

[Footnote 2] Mother receives SSI and therefore is not required to comply with this service objective.

Notes of testimony, 2/6/12 at 11.

The Agency acknowledged that Mother complied with nearly all of the FSP objectives except for the second objective, demonstrating appropriate parenting skills. On October 14, 2011, the Agency filed a petition for goal change to adoption and involuntary termination of parental rights

pursuant to Sections 2511(a)(1), (2), (5), (8), and (b) of the Adoption Act ("the Act"), 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). The trial court held an evidentiary hearing on the Agency's petition on February 6, 2012 and July 12, 2012. At the hearing, the Agency presented the testimony of Dr. Howard Rosen, a licensed psychologist; Dr. Kelly Kline, a pediatrician who provided well-child care to Child since birth; Molly Sullivan, Agency caseworker; Candra Chang, a family therapist with Pressley Ridge who provided Mother with reunification services; and Peggy Smith, the foster mother. Testifying for Mother was Lauren Eby, an intensive case manager with Keystone Services Systems, a mental health services provider. The guardian *ad litem*, Nancy Prescott, Esq., also testified.

On August 30, 2012, the trial court entered an order terminating Mother's parental rights and changing the permanency goal to adoption. On October 1, 2012, Mother filed a notice of appeal from the August 30th order along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).[2] The trial court filed its Rule 1925(a) opinion on December 4, 2012.

On appeal, Mother raises two issues:

A. DID THE TRIAL COURT ERR WHEN IT ORDERED THE TERMINATION OF THE PARENTAL RIGHTS OF [MOTHER] IN [CHILD] BECAUSE SUCH TERMINATION WAS AN EXTREME REMEDY AND AGAINST THE GREATER WEIGHT OF THE EVIDENCE TENDING TO SHOW THAT [MOTHER] WAS MAKING SIGNIFICANT PROG-

**2.** The thirtieth day of the appeal period fell on Saturday, September 29, 2012. Saturday, the 29th, and Sunday, September 30, 2012 are excluded from the computation of time. 1

Pa.C.S.A. § 1908. Therefore, appellant's appeal filed on Monday, October 1, 2012, is timely filed.

RESS TOWARDS REUNIFICA-TION WITH [CHILD]?

B. DID THE TRIAL COURT ERR WHEN IT ORDERED THE TERMINATION OF THE PARENTAL RIGHTS OF [MOTHER] IN [CHILD] BECAUSE THE EVIDENCE ADDUCED AT TRIAL WAS LEGALLY INSUFFICIENT AS A MATTER OF LAW TO SUPPORT THE COURT'S FINDING THAT TERMINATION WAS WARRANTED?

Mother's brief at 4.

Both of Mother's claims are premised upon her contention that she was substantially compliant with all her FSP objectives except for one. Mother maintains that the termination of her parental rights was an extreme remedy and ran contrary to the weight and sufficiency of the evidence that showed she was making significant progress towards reunification. (*Id.* at 9–10.) These claims fail.

 We conduct our review according to the following standard:

When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re R.N.J.*, 985 A.2d 273, 276 (Pa.Super.2009), quoting *In Re S.H.*, 879 A.2d 802, 805 (Pa.Super.2005), *appeal denied*, 586 Pa. 751, 892 A.2d 824 (2005). The burden is upon the petitioning person or agency to prove by clear and convincing evidence that its asserted grounds for seeking the termination of parental rights are valid. *Id.* Moreover, we have explained:

The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*Id.*, quoting *In re J.L.C.*, 837 A.2d 1247, 1251 (Pa.Super.2003). The trial court is free to make all credibility determinations, and may believe all, part, or none of the evidence presented. *In re M.G.*, 855 A.2d 68, 73–74 (Pa.Super.2004). If the findings of the trial court are supported by competent evidence, we will affirm even if the record could also support the opposite result. *In re Adoption of T.B.B.*, 835 A.2d 387, 394 (Pa.Super.2003).

This court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of Section 2511(a). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super.2004) (*en banc*), *appeal denied*, 581 Pa. 668, 863 A.2d 1141 (2004). In this case, the trial court terminated Mother's parental rights under Sections 2511(a)(1), (2), (5), (8), and (b), of the Act. On appeal, we will focus on Section 2511(a)(8) and (b). These sections provide as follows:

**§ 2511. Grounds for involuntary termination**

(a) **General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . . .

(8) The child has been removed from the care of the parent by the court

or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

(b) Other considerations.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(8) and (b).

Mother argues that the decision reached by the trial court "is inapposite to the testimony presented." (Mother's brief at 13.) Basically, Mother is arguing that the trial court failed to give sufficient weight to the testimony of witnesses who supported the position that Mother had made significant improvement in both her mental health condition and her ability to parent Child. (*Id.*)

■ We turn our attention to Section 2511(a)(8).

Section (a)(8) sets a 12–month time frame for a parent to remedy the conditions that led to the children's removal by the court. Once the 12–month period

has been established, the court must next determine whether the conditions that led to the child[ren]'s removal continue to exist, despite the reasonable good faith efforts of DHS supplied over a realistic time period. Termination under Section 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of DHS services.

*In re K.Z.S.*, 946 A.2d 753, 759 (Pa.Super.2008).

The first element of Section 2511(a)(8) has been met. Child has been in Agency care for a period of 24 months from the adjudication of dependency until the Agency filed the termination and goal change petition.[3]

We now examine the second element of Section 2511(a)(8), whether the conditions which led to Child's placement continue to exist. Child was removed by the Agency due to concerns related to Mother's mental health and significant lack of parenting skills. It is undisputed that Mother has complied with the following FSP objectives: Mother has been compliant with receiving mental health and medication management; attending court hearings, Agency meetings and treatment plan meetings; maintaining appropriate, safe, and stable housing; maintaining weekly visitation with Child; staying in contact with the Agency; signing all releases of information requested by the Agency. However, regarding objective number two, "demonstrate appropriate parenting skills and interaction with [Child]," Mother has been unable to fully comply. We note this is the reason Child was removed from her care in the first place.

The trial court opined:

---

**3.** November 2009 to October 2011.

In this case, unlike many others, we did see that Mother made commendable effort to comply with service objectives. However, serious impediment remains which renders Mother unable to safely parent [Child].

We emphasize that we reach this conclusion as to termination not upon the fact of Mother's mental retardation, but rather, upon facts which demonstrate Mother's inability to overcome obstacles to safely parent [Child], even with more than twelve months of services.

In so determining, we gave significant weight to the testimony of Dr. Rosen. We were persuaded by Dr. Rosen's conclusion that while management of Mother's mental health may fluctuate, her limited cognitive ability, that of an eight or ten year old, renders her vulnerable to a variety of hazards, threats, and daily life challenges which would place [Child] at constant risk.

We also recognize that Mother's challenges continued to exist even though she has received parenting education since approximately 2007. We considered the fact of the termination of parental rights to her other children relevant to Mother's lack of ability to achieve independence in parenting, in spite of many years of efforts, not only by the service providers, but Mother herself.

Trial court opinion, 12/4/12 at 16–17.

In support of her position that the trial court failed to place appropriate weight on testimony favorable to her, Mother points to the testimony of Candra Chang, a family therapist employed by the reunification service, and Lauren Eby, an intensive case manager employed by Keystone Services and assigned to Mother's case management needs. Mother references the following testimony:

Question: Is there a reason that you never moved on at that point to [unsupervised] visitation?

Ms. Chang: Yes, because the agency stated that they didn't feel it was in the best interest of [Mother] or [Child] to continue with those types of visits.

Question: Did you agree with that assessment?

Ms. Chang: No, I did not.

Question: Why didn't you agree with that?

Ms. Chang: Because [Mother] had made consistent progress during observations that she could have moved forward.

Notes of testimony, 2/6/12 at 102.

Lauren Eby was asked about Mother's progress from June of 2009 until present. She responded:

[Mother's] displayed much more independence than when we originally started working with her. You can definitely tell the difference from when she was depressed when she started with us to being more focused on her recovery and maintaining her independence in the community, being very proactive with following through with her treatment as opposed to relying on services or prompting that will remind her to attend the appointments.

Notes of testimony, 7/12/12 at 75.

The trial court discussed the testimony of Ms. Chang and Ms. Eby as follows:

We acknowledge the testimony of caseworkers Ms. Chang and Ms. Eby, who each opined that based upon Mother's progress, she could capably and independently care for [Child]. However, we found more persuasive testimony of the observations of the guardian *ad litem*, Ms. Prescott, pediatrician Dr. Kelly [Kline], and Agency caseworker Molly Sullivan. Each provided specific examples in support of the conclusion that,

without supervision, Mother lacked an ability to respond to [Child's] cues and therefore safely feed and care for her.

Trial court opinion, 12/4/12 at 17.

The record reflects Dr. Kline provided testimony regarding Mother's interactions with Child as recently as June of 2011. (Notes of testimony, 2/6/12 at 70.) During an office visit, Dr. Kline stated Child had a cold with a runny nose. (*Id.* at 71.) Mother was holding Child yet she failed to take a tissue and wipe Child's nose. (*Id.*) Dr. Kline spoke further about Mother's interaction with Child. She stated Child was crying, yet Mother did not try to soothe or console her. (*Id.* at 75.) The doctor believed Mother held Child in an unusual manner, under the rib cage and extended from her. (*Id.*) The doctor stated Mother never asked her any questions nor did she indicate she had any concerns about Child. (*Id.* at 74.) Dr. Kline noted that Mother struggled to help Child get dressed when the examination was over. (*Id.* at 76.)

Nancy Prescott, Esq., the guardian *ad litem,* testified on July 12, 2012. Her observation of Mother and Child had taken place during the first half of 2012. (Notes of testimony, 7/12/12 at 100–102.) Following her review of other evaluations and her discussions with caseworkers, she wrote a letter to the court with her recommendation that Mother's parental rights should be terminated. (*Id.*) In her letter, Ms. Prescott stated that Mother knows how to go through the motions necessary to provide basic care to Child, but her actions belie her understanding of the rationale or reason behind the steps of basic childcare. (*Id.* at 103.) She testified she was concerned how Mother carried Child down the stairs; Mother was "squeezing her chest and the child was dangling, and it was a very deep scare for me." (*Id.* at 104.) Ms. Prescott concluded, "I think mom was

trying to provide the proper support but was unable to figure out how to do it. That was my impression." (*Id.*)

Molly Sullivan, the Agency caseworker, testified that although Mother was receiving intensive reunification services, she continued to demonstrate an inability to understand and assess safety issues. Ms. Sullivan listed the following examples. Mother had given Child a basket of candy containing hard candies and lollipops that Child could have choked on. (Notes of testimony, 2/6/12 at 15.) There was an incident where Mother took earrings out of Child's ears and was going to put them in the pockets of Child's pants. (*Id.*) That was a concern because Child could have choked on them. (*Id.*) Also, Ms. Sullivan witnessed Mother giving Child large pieces of spaghetti and meatballs that were difficult for Child to chew and swallow. (*Id.*) Ms. Sullivan pointed out that Mother had been given intensive instruction regarding choking hazards. (*Id.* at 18–19.)

The trial court summarized Dr. Rosen's testimony as follows:

Dr. Howard Rosen, a licensed psychologist, conducted two mental health evaluations of Mother, upon referral for assessment of Mother's intellectual and emotional functioning. Dr. Rosen evaluated Mother most recently March 16, 2009. (N.T. 2/6/12, p. 47) Dr. Rosen diagnosed Mother as having bipolar disorder, post-partum depression, and post-traumatic stress disorder. (N.T. 2/6/12, pp. 56–57)

Dr. Rosen concluded that Mother lacked judgment and problem solving abilities sufficient to independently safely care for a child. (N.T. 2/6/12, pp. 47–48) Intelligence tests demonstrated Mother's intelligence as very significantly low, in the lowest one percent of the adult population, mild mental retardation. (N.T. p. 49) Mother possesses a

mental age of an 8–10 year old. (N.T. 2/6/12, pp. 49–50) Dr. Rosen opined that because of Mother's limited intellectual abilities, she has a low tolerance for frustration, and an inability to respond quickly to problems. (N.T. 2/6/12, p. 48) As a result of her low tolerance for frustration, Mother would become overwhelmed by the demands and frustrations of parenting. *Id.* Dr. Rosen testified that the daily struggles, including economic stresses, are overwhelming with a person of Mother's mental capacity. (N.T. 2/6/12, p. 50) In 2009, Dr. Rosen recommended more intensive services as well as partial hospitalization. (N.T. 2/6/12, pp. 50–51)

Dr. Rosen opined that issues such as Mother's depression could change or improve, her intellectual capacity will remain constant. (N.T. 2/6/12, p. 51) Because of Mother's low intellectual ability, she is vulnerable to recurrence of depression and other mental health problems, particularly when faced with the demands of the stresses and frustrations of parenting a young child. (N.T. 2/6/12, p. 53) Dr. Rosen testified that Mother's mental health might appear well at certain periods, absent the demands of caring for a child. However, he expressed deep concern as to Mother's capacity to maintain good capacity to parent under ordinary stressful life situations. (N.T. 2/6/12, pp. 52–53; pp. 60–61) Dr. Rosen cited as an example a situation in which Mother began hitting herself when she became frustrated because the bus for which she waited at the mall was late. *Id.* Dr. Rosen opined that Mother lacks the frustration tolerance demanded by normal parenting. *Id.*

Dr. Rosen acknowledged that strategies exist for teaching one coping skills. However, regardless of intervention, Mother's limited intelligence renders her vulnerable to explosive reactions in situations in which she lacks the ability to calm herself, anticipate consequences, and choose the best course of action. (N.T. 2/6/12, pp. 62–63)

During counseling in 2007, Mother was defensive to any sort of feedback regarding areas which required improvement. (N.T. 2/6/12, p. 55) Mother's limited intelligence makes learning through communication very difficult; improving through traditional verbal therapy is unlikely. (N.T. 2/6/12, p. 59)

Dr. Rosen further acknowledged that while medication could periodically alleviate depression or post-traumatic stress disorder, medication compliance would be very difficult. *Id.*

Dr. Rosen opined that Mother is unable to recognize risk as a result of an impaired understanding of facts such as time, as it relates, for example, to administering medication to a child. (N.T. 2/6/12, pp. 53–54) Further, Dr. Rosen opined that Mother's limited intellectual abilities rendered her vulnerable to emotional, physical or sexual abuse, and that Mother would not recognize or be able to resolve a problem situation, or timely respond and report to an emergency. (N.T. 2/6/12, p. 55)

Trial court opinion, 12/4/12 at 4–5.

Based on the above, we find the trial court's credibility and weight determinations are supported by competent evidence in the record. *In re Adoption of S.P.,* 616 Pa. 309, 325–26, 47 A.3d 817, 826–827 (2012) ("[E]ven where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's

legal conclusions are not the result of an error of law or an abuse of discretion.").

We now turn to the last element of Section 2511(a)(8), whether termination of Mother's parental rights would best serve the needs and welfare of Child. At the conclusion of the July 12, 2012 hearing, Child was two years eight months old, and had lived in foster care her entire life. The Child's foster mother, Peggy Smith, testified that Child lives with her two half-sisters, ages 5 and 3, and an 11-month-old boy who is Child's half-brother. (Notes of testimony, 7/12/12 at 30.) She testified the children have a special bond and they all get along. (*Id.* at 30–31.) Child calls the Smiths "mommy" and "dad." (*Id.* at 51, 60.) Mrs. Smith described family activities such as camping, picnics with extended family, and going to Knoebel's Amusement Park. (*Id.* at 52.) Mrs. Smith testified that on the day Child is scheduled to visit with Mother, she cries, has tantrums, and clings to Mrs. Smith. (*Id.* at 53.)

This court has discussed the application of Section 2511(a)(8) in relation to a parent who has made progress meeting his or her FSP objectives. We explained:

> We recognize that the application of Section (a)(8) may seem harsh when the parent has begun to make progress toward resolving the problems that had led to removal of her children. By allowing for termination when the conditions that led to removal continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while the parent is unable to perform the actions necessary to assume parenting responsibilities. This Court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time, to wit eighteen months, in which to complete the process of either reunification or adoption for a child who has been placed in foster care.

*In re I.J.,* 972 A.2d 5, 11–12 (Pa.Super.2009).

Instantly, there is nothing in this record that would indicate Mother is close to or will ever be able to safely take care of and parent this child. We conclude that the trial court correctly found the Agency proved all elements of Section 2511(a)(8) by clear and convincing evidence. *See In the Interest of Lilley,* 719 A.2d 327, 332 (Pa.Super.1998) (termination petitions may be granted where a parent fails to cooperate or appears incapable of benefitting from the reasonable efforts supplied by an agency over a realistic time period).

We now must examine whether the trial court correctly determined that Mother's conduct warrants termination according to Section 2511(b). Pursuant to Section 2511(b), the trial court must engage in an analysis of the best interests of the child by taking into primary consideration the developmental, physical, and emotional needs of the child. *In re Adoption of R.J.S.,* 901 A.2d 502, 508 (Pa.Super.2006). The trial court must consider "intangibles such as love, comfort, security, and stability." *In re C.P.,* 901 A.2d 516, 520 (Pa.Super.2006). To this end, this court has indicated that the trial court "must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond." *In re C.L.G.,* 956 A.2d 999, 1009 (Pa.Super.2008).

Instantly, the trial court found that "no emotional bond exists between Mother and [Child] which, if broken, would be detrimental to [Child's] best interests. The record contained numerous examples of

Mother's inability [to] positively interact and display emotion toward [Child]. There is no evidence that [Child] feels a bond toward Mother." (Trial court opinion, 12/4/12 at 19.)

The trial court also noted that it believed Mother loves her child. (*Id.*) However, we have held that a parent's own feelings of love and affection for a child do not prevent termination of parental rights. *See In re L.M.*, 923 A.2d 505, 512 (Pa.Super.2007). The testimony was uncontroverted that the foster parents have a stable, loving, and secure relationship with Child. It is the foster parents who have provided Child with excellent care and who have committed to her developmental, emotional, and medical needs. The foster parents are committed to Child and her half-siblings. We conclude the trial court did not abuse its discretion when it ruled that termination of Mother's parental rights was in Child's best interests, and that the termination would serve Child's well-being by allowing her to be with her foster family, with whom she was bonded.

Accordingly, the order terminating Mother's parental rights and changing the permanency goal to adoption is affirmed.

Order affirmed.

