J-S41028-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: Z.J., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: B.J., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1797 EDA 2025 |

Appeal from the Order Entered June 17, 2025
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000752-2023

| | | |
|---|---|---|
| IN THE INTEREST OF: Z.T.M.J., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: B.J., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1798 EDA 2025 |

Appeal from the Decree Entered June 17, 2025
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000228-2025

BEFORE: BOWES, J., BECK, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY BECK, J.:                    **FILED DECEMBER 9, 2025**

_____

[*] Retired Senior Judge assigned to the Superior Court.

B.J. ("Mother")[1] appeals from the decree entered by the Philadelphia County Court of Common Pleas ("juvenile court") granting the petition of Philadelphia Department of Human Services ("DHS") to terminate their parental rights to Z.J. ("Child") pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b).[2] Mother also appeals from the juvenile court's order changing Child's permanency goal from reunification to adoption pursuant to 42 Pa.C.S. § 6351. Mother's counsel, Attorney James W. Martin ("Attorney Martin"), has filed a petition to withdraw and brief pursuant to **Anders v. California**, 386 U.S. 738 (1967), and **Commonwealth v. Santiago**, 978 A.2d 349 (Pa. 2009). After review, we grant Attorney Martin's petition to withdraw and affirm the termination decree and goal change order.

DHS established at the hearing that Mother used methamphetamines and fentanyl during their pregnancy with Child, which was reported to DHS upon Child's birth in July 2023. N.T., 6/17/2025, at 8. Initially, DHS did not

_____

[1] Because this Court redacts full names to protect families' privacy, we refer to parties by their legal relationship for ease of review. In accordance with their preference, we use they/them pronouns to refer to Mother. **See** N.T., 6/17/2025, at 9. Despite establishment of Mother's preference at the beginning of the hearing regarding the petitions at issue in this case, many participating individuals did not use Mother's preferred pronouns at the hearing and on appeal. As this Court has emphasized many times, a hearing to terminate parental rights is one of the most emotional legal proceedings a person may endure. We respectfully remind all involved to heed the upmost care to not compound, even inadvertently, any emotional trauma by misgendering a party and/or disregarding a person's self-identification.

[2] In a separate decree, the juvenile court involuntarily terminated the parental rights of Child's father, O.K. ("Father"). Father did not appeal.

remove Child, and Mother and Child resided together at an inpatient treatment facility. *Id.* at 9. The facility discharged Mother for noncompliance in August 2023, prompting DHS to obtain an emergency order of protective custody placing Child into foster care at that time. *Id.* at 9; *see also* DHS Exhibit 3 (August 17, 2023 order). On October 11, 2023, the juvenile court adjudicated Child dependent and ordered Child to remain in foster care pursuant to DHS's physical and legal custody. DHS Exhibit 3 (10/11/2023 order). The juvenile court permitted Mother to visit with Child under supervision and ordered Mother to undergo treatment for substance abuse. *Id.*

DHS, through the CUA, established case plan objectives and goals for Mother to address. They included abiding by any juvenile court orders, signing releases, obtaining and maintaining appropriate housing, visiting Child, completing ARC workshops, engaging in mental health and substance abuse treatment, and being available for CUA services. *See* N.T., 6/17/2025, at 20.

Initially, Mother complied with substance abuse treatment and had success in achieving sobriety, prompting the juvenile court to return Child to Mother's physical and legal custody under DHS's protective supervision in January 2024. DHS Exhibit 3 (1/9/2024 order). Mother and Child reunified at Hutchinson House, which is a substance abuse treatment facility that permits mothers to live with their babies. *See* N.T., 6/17/2025, at 14, 23.

Unfortunately, the reunification lasted only three weeks before DHS obtained an emergency order of protective custody from the juvenile court.

DHS Exhibit 3 (1/31/2024 order). DHS removed Child from Mother's custody because it learned Mother was "not consistent or noncompliant with services" and the only person Mother identified to assist them with childcare for Child while Mother attended to a medical problem was a staff member at Hutchinson House with a conflict of interest between helping Mother personally and providing Mother treatment services professionally. *See* N.T., 6/17/2025, at 22-24. It also appears that Mother was hospitalized, as the juvenile court's order permitting supervised visits referred to the visits beginning upon release from a hospital. DHS Exhibit 3 (1/31/2024 order). In addition to requiring Mother to undergo drug screens, the juvenile court ordered Mother to treat their mental health and substance abuse through dual diagnosis treatment; to obtain housing; and to obtain employment. *Id.*

Child returned to the foster home of T.E. ("Foster Mother"), where she had been placed previously. Child remained in Foster Mother's home throughout the remainder of the case.

After Child's second removal, Mother had some successes addressing the issues that were preventing them from having legal and physical custody of Child. In permanency review hearings during 2024, the juvenile court assessed Mother's compliance with their goals as moderate and then substantial for several hearings in a row, before returning to moderate. *See id.* (4/30, 7/9, 9/4, 12/3/2024 orders). Mother's compliance with services corresponded with findings of improved progress in eliminating the reasons

Child came into care. *See id.* (4/30/2024 order finding minimal progress, 7/9/2024 order finding substantial progress, 12/3/2024 order finding moderate progress). During this time, Mother engaged in substance abuse treatment at Morris House, from which they achieved a successful discharge in October 2024. *Id.*; N.T., 6/17/2025, at 32. From there, they entered dual diagnosis treatment at Interim House. *See* DHS Exhibit 3 (12/3/2024 order).

Throughout most of 2024, the permanency review orders indicate that the juvenile court permitted Mother to have supervised visits with Child twice a week. *See id.* (4/30, 7/9, 9/4, 12/3/2024 orders).[3] DHS did not introduce evidence establishing how many times Mother visited with Child during this timeframe. CUA Case Manager Supervisor Brianna Palmer ("Palmer") was unable to provide an "exact number" regarding Mother's participation in visits, but she described Mother's visits as "a bit inconsistent" as Mother was in and out of treatment. N.T., 6/17/2025, at 26-27.[4]

_____

[3] In September 2024, the juvenile court ordered supervised visits but permitted the parties to expand Mother's visits to unsupervised at Morris House. *See* DHS Exhibit 3 (9/6/2024 order). The record does not indicate whether unsupervised visits occurred before Mother completed the program.

[4] This corresponded with testimony from Foster Mother as part of Child's case. Prior to Mother's last two visits in December 2024 and March 2025, Foster Mother recalled Mother's visits as being "inconsistent" for most of the case. *Id.* at 67.

Sadly, Mother relapsed into substance abuse, reflected in a drug screen that occurred on December 3, 2024[5] that was positive for amphetamines and cocaine. DHS Exhibit 4; N.T., 6/17/2025, at 30. Their formerly good communication with CUA "fell off." N.T., 6/17/2025, at 21. They stopped visiting Child, save for one visit in March 2025. *Id.* at 25.[6] It was unclear where Mother actually lived. *Id.* at 34. They provided CUA with an address for purposes of mail and told CUA that it was "not permanent" and they "were between there and somewhere else." *Id.* at 48, 50-51. CUA Outcome Specialist Fateema Boldon ("Boldon") met Mother outside at this address three times but Mother would not permit Boldon to enter the house to assess it or disclose who lived there. *Id.* at 50-51. Boldon observed "a lot of in and out traffic," including a person with a drug pipe, prompting her to describe the house as having a "flop door." *Id.* at 47-48. Mother was no longer engaged in mental health or substance abuse treatment. *Id.* at 29, 31. Their mental health deteriorated, reflected by statements in March 2025 of suicidal ideations and "threats" to Child's foster mother concerning Child on April 18,

_____

[5] This screen is dated the same day as the permanency review hearing finding that Mother made moderate progress. Presumably, Mother submitted to the screen after the hearing.

[6] On June 6, 2025, several weeks before the hearing, Mother asked CUA about visiting Child. *Id.* at 61. According to Labbon, there was insufficient time to set up the visit pursuant to their own internal procedures because Mother was no longer on the visit list. *Id.* at 63, 65. Thus, Mother only saw Child once between their relapse in December 2024 and the hearing in June 2025. *Id.*

2025. *Id.* at 27-29, 46. The certified record does not reveal the nature of the threats, but the threats combined with Mother's suicidal ideations and ongoing untreated mental health caused Palmer to believe that Mother was not capable of safely parenting Child unsupervised. *Id.* at 27-29, 35. At the March 3, 2025 permanency review hearing, the juvenile court found that Mother was not compliant with their goals and had made no progress since the last hearing in rectifying the issues that brought Child into care. *Id.* (3/3/2025 order).

Regarding Child's needs and welfare, Palmer testified that there was minimal-to-no parent-child relationship between Child and Mother based upon Mother's inconsistent visits, emphasizing that as of the termination hearing, Mother had not visited since March 2025. *Id.* at 35-36. Palmer, Boldon, and CUA Case Manager Courtney Labbon ("Labbon") opined that, based upon their observations and interactions, Child's relationship with Foster Mother is positive; Foster Mother has provided Child with stability and support; Child is thriving physically, emotionally, and developmentally; Child and Foster Mother share a parent-child bond; and Child looks to Foster Mother to meet her everyday needs. *See id.* at 15-17, 37-38, 55-56. The CUA witnesses agreed that protecting Child's relationship with Foster Mother is important to ensure Child's continued success and that termination of Mother's rights and adoption by Foster Mother best meets Child's needs and welfare. *Id.* at 16, 35, 37-39, 56.

Attorney Hart presented testimony from Foster Mother. Foster Mother stated that Child is advanced developmentally and is demonstrating cognitive skills "more so like a three[] or four[]year[]old." *Id.* at 68. Foster Mother testified that she and Child are bonded, but she is concerned that Child's attachment to her is "anxious" based upon Child's "full meltdowns" when she leaves. *Id.* Foster Mother had made some progress in helping Child feel secure when she was not with her, but after Child visited with Mother in March, Child displayed regressive behaviors such as refusing to sleep in her own crib, screaming and displaying an expression of "deep concern" when Foster Mother left (even for a short time), and wanting her pacifier. *Id.* at 69. Foster Mother testified that she intends to adopt Child. *Id.*

Mother testified on their own behalf. They stated that their current housing was the same one previously described as having a flop door, acknowledging that the housing was not appropriate for Child. N.T., 6/17/2025, at 73. Mother testified that they suffer from post-traumatic stress disorder, major depression, and anxiety. *Id.* at 75. They stopped going to mental health treatment in February 2025 but had an appointment scheduled. *Id.* at 75-76. Mother admitted that they had not engaged in substance abuse treatment since November 2024. *Id.* at 76-78, 83-86.[7] Mother provided CUA

_____

[7] Mother presented a document purporting to be a certificate of completion of a weeklong drug treatment in November 2024 from Bowling Green. ***See*** Mother's Exhibit 1. DHS and Child objected to the certificate as hearsay; the
*(Footnote Continued Next Page)*

with proof of social security income and stated that they participated in a parenting class, a housing workshop, and a money management class. *Id.* at 79; *see also id.* at 33. Mother was aware of and understood their goals and did not dispute that they had outstanding goals to complete. *Id.* at 81, 84. When asked whether they had a timeline in which they could see themselves achieving these goals, they responded, "no." *Id.* at 81. They also testified that Child was not bonded to them. *Id.* at 80. They attributed the lack of a bond to CUA's alleged denial of visits to them from January 2025 to present despite their requests for visits. *See id.* at 73-74, 81.

After receiving the above evidence, the juvenile court terminated Mother's parental rights pursuant to sections 2511(a)(1), (2), (5), (8), and (b), and changed Child's permanency goal to adoption. Mother timely appealed and filed a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925. The juvenile court issued an opinion indicating that it had announced its reasons for terminating Mother's parental rights at the conclusion of the hearing. Juvenile Court Opinion, 9/5/2025, at 1 (citing N.T., 6/17/2025, at 88-94).[8]

_____

trial court sustained the objection and did not admit the certificate. N.T., 6/17/2025, at 85-86.

[8] The Adoption Act provides children with the right to counsel in contested termination of parental rights proceedings. 23 Pa.C.S. § 2313(a). The Juvenile Act and the Rules of Juvenile Court Procedure govern a child's right to counsel and/or a guardian ad litem in dependency matters, which
*(Footnote Continued Next Page)*

When an ***Anders*** brief is before this Court, we may not review the merits of any possible underlying issues without first examining counsel's request to withdraw. ***In re Adoption of B.G.S.***, 240 A.3d 658, 661 (Pa. Super. 2020); ***see also In re S.M.B.***, 856 A.2d 1235, 1237 (Pa. Super. 2004) (explaining that the ***Anders***/***Santiago*** procedure for court-appointed counsel seeking to withdraw has been extended to appeals involving termination of parental rights). To withdraw pursuant to ***Anders***, counsel must "petition the court for leave to withdraw stating that, after making a conscientious examination of the record, counsel has determined that the appeal would be frivolous[.]" ***In re J.D.H.***, 171 A.3d 903, 907 (Pa. Super. 2017) (citation omitted). Additionally, counsel must file an ***Anders*** brief that satisfies the following criteria:

---

encompasses a goal change hearing. 42 Pa.C.S. §§ 6311, 6337, 6337.1(a); Pa.R.J.C.P. 1151, 1154. Child was represented at the hearing by Attorney Meagan Hart of the Defender Association of Philadelphia, an organization that the juvenile court had appointed to represent Child as guardian ad litem at the inception of her dependency matter. At the outset of the termination and goal change hearing, the juvenile court noted that Child's position was not discernable because of her young age—just shy of two—and that Attorney Hart was able to represent Child's best and legal interests in the termination proceeding without conflict. N.T., 6/17/2025, at 7; ***see In re. T.S.***, 192 A.3d. 1080, 1092 (Pa. 2018) (finding that where the child's preferred outcome is unverifiable because of a child's young age, no conflict of interest exists between the child's legal and best interests for purposes of attorney representation of the child at termination proceedings); ***see also In re Adoption of K.M.G***., 240 A.3d 1218, 1235 (Pa. 2020) ("where an orphan's court has appointed a GAL/[c]ounsel to represent both the child's best interests and legal interests, appellate courts should review sua sponte whether the [family] court made a determination that those interests did not conflict").

(1) provide a summary of the procedural history and facts, with citations to the record;

(2) refer to anything in the record that counsel believes arguably supports the appeal;

(3) set forth counsel's conclusion that the appeal is frivolous; and

(4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

*B.G.S.*, 240 A.3d at 661 (quoting *Santiago*, 978 A.2d at 361). Counsel also must provide a copy of the *Anders* brief to the client, along with a letter that advises the client of the immediate right to either retain new appellate counsel or proceed pro se, and to "raise any points that the appellant deems worthy of the court's attention in addition to the points raised by counsel in the *Anders* brief." *In re X.J.*, 105 A.3d 1, 4 (Pa. Super. 2014) (citation and brackets omitted).

"Once counsel has satisfied the above requirements, it is then this Court's duty to conduct its own review of the trial court's proceedings and render an independent judgment as to whether the appeal is, in fact, wholly frivolous." *Id.* (citation omitted). Our independent review is not limited to the issues that counsel discussed in the *Anders* brief, but extends to "additional, non-frivolous issues" that counsel may have overlooked. *J.D.H.*, 171 A.3d at 908 (citation omitted). An appeal is frivolous when it "lacks any basis in law or fact." *Santiago*, 978 A.2d at 356 (citation omitted).

We conclude that Attorney Martin's petition to withdraw and **Anders** brief comply with the requirements outlined above. Attorney Martin has filed a petition with this Court seeking to withdraw his representation. Although he does not directly state in his petition to withdraw that his conscientious examination of the record resulted in his conclusion that the appeal is frivolous, he references **Anders** and **Santiago** therein, and his **Anders** brief includes this statement. **See** Petition to Withdraw Appearance as Counsel, 10/8/2025; **Anders** Brief at 11-12. Further, Attorney Martin attached the letter he sent to Mother, which enclosed the petition and **Anders** brief. **See** Letter, 10/8/2025. Attorney Martin's letter advised Mother of the right to proceed pro se or with new counsel, and to raise any additional issues that Mother deems worthy of this Court's consideration. **Id.** In conformance with **Santiago**, Attorney Martin's brief includes summaries of the facts and procedural history of the case, raises the issues arguably supporting Mother's appeal, and sets forth his conclusion that the appeal is frivolous, including discussion and citations to the record in support of his conclusion. **Anders** Brief at 6-19. Because Attorney Martin has complied with the technical and procedural requirements for withdrawing from representation, we turn our attention to the issues raised in the **Anders** brief, which is whether the

juvenile court erred or abused its discretion by terminating Mother's parental rights and changing Child's permanency goal to adoption. *See id.* at 6.[9]

We begin with the trial court's decision to terminate Mother's parental rights. The Adoption Act requires courts to engage in a bifurcated process when considering a petition to terminate an individual's parental rights. "Courts must begin by first considering whether a parent's conduct warrants termination under section 2511(a) prior to shifting its focus to whether termination best serves the child's needs and welfare." *In re Adoption of G.W.*, 342 A.3d 68, 82–84 (Pa. Super. 2025) (en banc). The petitioner only needs to prove one of the eleven distinct grounds under subsection (a) to shift the focus to section 2511(b), which requires the court to determine whether termination serves the child's developmental, physical, and emotional needs and welfare. *In re K.R.*, 200 A.3d 969, 979 (Pa. Super. 2018) (en banc). The party seeking termination must prove the elements of section 2511 by clear and convincing evidence, which is evidence that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Matter of Adoption of L.C.J.W.*, 311 A.3d 41, 48-49 (Pa. Super. 2024).

---

[9] Mother has not filed a brief through new counsel or pro se. DHS notified this Court via letter that it agreed with the juvenile court's decision and would not be submitting an appellee's brief. Attorney Hart did not file a brief.

We adhere to the following standard when reviewing a juvenile court's decision to terminate parental rights involuntarily:

In cases concerning the involuntary termination of parental rights appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. This standard of review corresponds to the standard employed in dependency cases, and requires appellate courts to accept the findings of fact and credibility determinations of the [juvenile] court if they are supported by the record, but it does not require the appellate court to accept the [juvenile'] court's inferences or conclusions of law. That is, if the factual findings are supported, we must determine whether the [juvenile] court made an error of law or abused its discretion. An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion; we reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will.

*In re Adoption of C.M.*, 255 A.3d 343, 358-59 (Pa. 2021) (quotation marks, brackets, and citations omitted). Further, in conducting our review, we take care to heed our Supreme Court's words of caution and abide by its specific instructions regarding our appellate role:

Termination of parental rights is among the most powerful legal remedies that the judicial system possesses. The decision to sever permanently a parent's relationship with a child is often bound up in complex factual scenarios involving difficult family dynamics and multiple service providers. Our [juvenile] courts are tasked with carefully considering and weighing all of the evidence presented at termination hearings in determining whether the petitioning party has met its burden of proving by clear and convincing evidence that termination meets the exacting standards outlined in the Adoption Act.

Because [juvenile] courts are on the front lines assessing the credibility of witnesses and weighing competing and often challenging evidence, it is paramount that, in reviewing [juvenile] courts' decisions in this arena, appellate courts defer to [juvenile] courts' first-hand observations as they relate to factual

- 14 -

determinations. In this regard, we reiterate that appellate courts must review such decisions for an abuse of discretion or error of law, and appellate courts may reverse [juvenile] courts only when that discretion has been breached or when the law has been misapplied. In other words, an appellate court should review the certified record to decide whether it supports the [juvenile] court's order, regardless of whether the appellate court agrees with the result that the [juvenile] court reached.

*Interest of S.K.L.R.*, 256 A.3d 1108, 1129 (Pa. 2021).

This Court may affirm the juvenile court's decision to terminate parental rights pursuant to any one subsection of section 2511(a), as well as subsection (b). *In re J.F.M.*, 71 A.3d 989, 992 (Pa. Super. 2013). As such, we focus our analysis on sections 2511(a)(8) and (b) of the Adoption Act.

Section 2511(a)(8) provides for termination of parental rights under the following circumstances:

The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S. § 2511(a)(8). Thus, to terminate parental rights under section 2511(a)(8), the petitioner must prove: (1) the child has been removed from parental care for 12 months or more; (2) the conditions that led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child. *Id.*; *In re C.L.G.*, 956 A.2d 999, 1008-9 (Pa. Super. 2008) (en banc). Notably, in contrast to certain other provision of section 2511(a), the court's focus under subsection

(a)(8) is not whether the parent has tried to change throughout the child's time in care or is capable of changing in the future. **G.W.**, 342 A.3d at 87. Rather, the second prong of subsection (a)(8) requires the court only to discern if the parent has, in fact, remedied the conditions that led to the child's removal or placement. **Id.** To that end, the relevant inquiry under the second prong of subsection (a)(8) is "whether reunification of parent and child is imminent at the time of the hearing." **In re I.J.**, 972 A.2d 5, 11 (Pa. Super. 2009). Further, "the court shall not consider any efforts by the parent to remedy the conditions described [in section 2511(a)(8)] which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S. § 2511(b).

Once a court determines that grounds exist to terminate parental rights, it must turn its attention to the third prong of subsection (a)(8) and subsection (b) regarding the child's needs and welfare.[10] Section 2511(b) provides in relevant part:

> The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

---

[10] Although separately enumerated with slightly different statutory language, this Court has interpreted the needs and welfare analyses required under subsections (a)(8) and (b) to utilize the same legal standards and to be based upon the same evidence. **G.W.**, 342 A.3d at 89 n.20.

- 16 -

23 Pa.C.S. § 2511(b).

Our analysis focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. *T.S.M.*, 71 A.3d at 267. "[T]he determination of the child's needs and welfare requires consideration of the emotional bonds between the parent and child. The utmost attention should be paid to discerning the effect on the child of permanently severing the parental bond." *Id.* (quotation marks omitted). It is not enough that there exists a bond between parent and child to avoid termination. *Interest of K.T.*, 296 A.3d 1085, 1109 (Pa. 2023). Rather, the juvenile court must determine whether the bond is "necessary and beneficial" to the child, such that "maintaining the bond serves the child's developmental, physical, and emotional needs and welfare." *Id.* at 1105-06. Focusing upon the "child's development, and mental and emotional health," the juvenile court should assess whether severing the bond "is the kind of loss that would predictably cause extreme emotional consequences or significant, irreparable harm" to the child. *Id.* at 1110-11.

Additionally, "the parental bond is but one part of the overall subsection (b) analysis[.]" *Id.* at 1113. The needs and welfare analysis must also include the consideration of factors such as: "the child's need for permanency and length of time in foster care …; whether the child is in a preadoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible

- 17 -

needs of love, comfort, security, safety, and stability." *Id.* (citations omitted). "These factors and others properly guide the court's analysis of the child's welfare and all [their] developmental, physical, and emotional needs." *Id.* Importantly, "[juvenile] courts have the discretion to place appropriate weight on each factor present in the record before making a decision regarding termination that best serves the child's specific needs." *Id.*

Thus, a court must examine the matter from the child's perspective, placing the child's "developmental, physical, and emotional needs and welfare above concerns for the parent." *Id.* at 1105. "[T]he law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved." *T.S.M.*, 71 A.3d at 268-69. The party seeking termination bears the burden of proving, by clear and convincing evidence, that termination of parental rights serves a child's needs and welfare. *K.T.*, 296 A.3d at 1105.

With these tenets in mind, we turn to the juvenile court's findings of fact and conclusions of law. The juvenile court found that, by Mother's "own admission," they have not satisfied their case plan objectives, "particularly those involving housing, mental health, and drug and alcohol." N.T., 6/17/2025, at 91-92. They have no suitable housing. *Id.* at 93. Mother completed a drug and alcohol program but subsequently tested positive for amphetamines and cocaine in December 2024. *Id.* at 91. Since this relapse,

they have not actively been engaged in treating their addiction or mental health, which are the reasons that Child came into care. *Id.* After twenty-one months in care, the juvenile court concluded that the conditions leading to Child's removal continue to exist, thereby satisfying the first two elements of subsection (a)(8). *Id.* at 92.

Regarding the final prong (a)(8) and subsection (b), the juvenile court determined that terminating Mother's parental rights will serve Child's needs and welfare, finding that by Mother's own admission Child does not share a parent-child bond with Mother; Child is placed in a loving home where her needs are met, she is thriving in the care of the preadoptive foster parent, and terminating parental rights would provide Child with permanency through adoption, which the juvenile court emphasized was vital for a child her age. *Id.* at 92-93.

Our review of the record, as detailed above, supports the juvenile court's findings. Child first entered foster care as an infant in 2023 because of Mother's substance abuse problems. This same condition (addiction) intertwined with Mother's difficulty managing mental health led to Child's second removal in January 2024. Compounding these issues is Mother's housing; the only suitable housing they have had for Child is in short-term mother/baby treatment facilities.

We recognize that for a time after removal in 2023 and throughout much of 2024, Mother successfully achieved sobriety and underwent treatment to

address their dual addiction and mental health issues. Once they relapsed by using drugs in December 2024, however, the record supports the court's finding that Mother never got back on track. The evidence amply supports the conclusion that the conditions that led to Child's two removals—substance abuse, mental health, and housing—continued to exist well beyond a year in care, with no indication that reunification was imminent. *See G.W.*, 342 A.3d at 87.

The record evidence also supports the court's conclusion that terminating Mother's parental rights best serves Child's needs and welfare. Child does not share a parent-child bond with Mother, as Mother admits. Even without their testimony, this is the logical inference, as Child has spent nearly her entire life in foster care apart from two brief periods of care by Mother, and Mother was inconsistent with visits. Any relationship forged through the mainly supervised visitation is not necessary and beneficial to Child at this juncture. *See K.T.,* 296 A.3d at 1105-06, 1110-11; *see also In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008) (stating "where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists"). Child, who was just about to turn two at the time of the hearing, has a parent-child bond with Foster Mother, who reliably has met her daily needs for most of her life. She has thrived in Foster Mother's care developmentally and demonstrates emotional security. Foster Mother is willing to provide Child permanency through adoption. These considerations

are supported by the record and comport with the analysis required by subsection (b), as outlined in *K.T.* *See K.T.*, 296 A.3d at 1113.

Based upon the evidence adduced at the termination hearing, we agree with Attorney Martin that any challenge to the trial court's discretion in terminating Mother's parental rights would be wholly frivolous, whether the challenge was based upon the grounds of (a)(8) or (b).

As for a challenge to the trial court's decision to change Child's permanency goal to adoption, we agree with Attorney Martin that such a challenge would likewise be frivolous. The Juvenile Act requires the juvenile court to conduct regular permanency hearings and make certain factual findings. *See* 42 Pa.C.S. § 6351(e), (f), (f.1). At the conclusion of a permanency hearing, the court must "order the continuation, modification or termination of placement or other disposition which is best suited to the safety, protection and physical, mental and moral welfare of the child." *Id.* § 6351(g). A goal change is a term of art referring to the court's subsection (g) determination, reached after considering the various permanency plan options in subsection (f.1). *See id.* § 6351(f.1), (g); *In re R.J.T.*, 9 A.3d 1179, 1183 n.6 (Pa. 2010). We review a court's decision to change a goal under an abuse of discretion standard. *In Int. of L.T.*, 158 A.3d 1266, 1278 (Pa. Super. 2017).

Notably, a goal change to adoption is not a necessary prerequisite to allow a trial court to involuntarily terminate a parent's rights. *See In re*

*Adoption of S.E.G.*, 901 A.2d 1017, 1029 (Pa. 2006). As the trial court has terminated Mother's parental rights to Child, we have concluded that any challenge to the juvenile court's discretion in doing so is wholly frivolous. *Int. of D.R.-W.*, 227 A.3d 905, 917 (Pa. Super. 2020) (*citing In re D.A.*, 801 A.2d 614, 616 (Pa. Super. 2002), for the proposition that "[a]n issue before a court is moot if in ruling upon the issue the court cannot enter an order that has any legal force or effect").

Alternatively, given the facts of this case—particularly those discussed in assessing Child's needs and welfare in the termination decision—the trial court unquestionably acted within its discretion to conclude that changing Child's permanency goal to adoption is in Child's best interest. *See Int. of A.M.*, 256 A.3d 1263, 1273 (Pa. Super. 2021) (stating parents' rights are secondary in a goal change proceeding to the child's "best interest, safety, permanency and well-being," which "must take precedence over all other considerations"). We conclude that any challenge by Mother to the trial court's discretion in changing Child's permanency goal to adoption would be wholly frivolous.

Our independent review of the record has disclosed no non-frivolous issues overlooked by Attorney Martin.[11] *See J.D.H.*, 171 A.3d at 908.

_____

[11] As part of our independent review, we considered whether Mother's testimony that CUA denied their requests for visits with Child and that Mother's prior dependency attorney ignored their request to file a motion could

*(Footnote Continued Next Page)*

Therefore, we grant Attorney Martin's petition to withdraw from representation and affirm the decree terminating Mother's parental rights to Child pursuant to section 2511(a)(8) and (b) and the order changing Child's permanency goal to adoption.

Petition to withdraw granted. Decree and order affirmed.

---

support non-frivolous challenges to the decree and order. *See* N.T., 6/17/2023, at 73-74, 81. We conclude that either challenge would be frivolous. Boldon and Labbon, whom the juvenile court found credible, offered testimony that contradicted Mother's claims. Labbon testified that Mother fell out of contact while struggling with their personal stability, and following their last visit in March, they requested a visit only weeks before the termination hearing. *See id.* at 61-65. Boldon testified that when she asked Mother if they wanted to visit in a text exchange sometime prior to April 2025, Mother responded that they would be dead by then. *Id.* at 46.

Even if Mother's testimony regarding requesting visits was believed, and their previous dependency attorney ignored their request to file a motion as Mother claimed, this does not change the analysis outlined herein regarding grounds for termination pursuant to section 2511(a)(8) and (b). *See In re D.C.D.*, 105 A.3d 662, 675 (Pa. 2014) (holding that a court may terminate parental rights even if an agency fails to make reasonable efforts regarding reunification if the agency otherwise proves its petition by clear and convincing evidence). In particular, the evidence in the record demonstrating that termination serves Child's needs and welfare was based upon more than Mother's absence from Child's life at the tail end of the case. While their absence since March certainly contributed to the lack of a bond, Mother's addiction issues, untreated mental health, and instability over the course of Child's young life resulted in two removals from Mother's care, and Mother had not remedied these conditions at the time of the termination hearing. Further, Child's lengthy stay in foster care was the primary basis for concluding that Child's best interest and needs and welfare are best met by terminating Mother's parental rights and freeing her for adoption by Foster Mother.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/9/2025