J-A02038-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| IN THE MATTER OF: THE ADOPTION OF: D.A.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: M.A.B., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1040 WDA 2025 |

Appeal from the Order Entered July 16, 2025
In the Court of Common Pleas of Westmoreland County Orphans' Court
at No(s): 74 of 2024

| IN THE MATTER OF: THE ADOPTION OF: C.R.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: M.A.B., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1041 WDA 2025 |

Appeal from the Order Entered July 16, 2025
In the Court of Common Pleas of Westmoreland County Orphans' Court
at No(s): 73 of 2024

BEFORE:  STABILE, J., MURRAY, J., and BECK, J.

MEMORANDUM BY BECK, J.:                    **FILED: December 30, 2025**

M.A.B. ("Father") appeals from the orders entered by the Westmoreland County Court of Common Pleas ("orphans' court") terminating his parental rights to D.A.B., born August 2018, and C.R.B., born September 2019 (collectively "Children"), pursuant to 23 Pa.C.S. § 2511(a)(2), (5), (8), and

(b). Because we conclude that the orphans' court did not abuse its discretion in terminating Father's parental rights, we affirm.

The orphans' court summarized the facts and procedural history of the case as follows:

The [Westmoreland County Children's Bureau ("the Agency")] first became involved with this family in October 2021, when services were provided to Father and [K.L.B. ("Mother")] due to drug abuse. On March 23, 2023, Children were placed in Agency custody due to Father having overdosed while having custody of Children. By recommendation for adjudication and disposition dated April 14, 2023, to which Father and Mother [(collectively, "Parents")] consented, Children were adjudicated dependent for being without proper care or control and were ordered to remain in the legal and physical custody of the Agency. Mother and Father were both ordered to undergo a drug and alcohol evaluation and comply with recommended treatment; take part in random drug screens; undergo a mental health/psychiatric evaluation and comply with recommended treatment; participate in parenting instruction, which included a parenting curriculum and/or hand-on parenting instruction; and secure and maintain a verifiable source of income.

Permanency review hearings were held on September 27, 2023, April 29, 2024, and January 2, 2025. At the September 27th review, … Father was minimally compliant with the permanency plan. He had poor attendance at parenting instruction and visitation and tested positive on [fifteen] of the [twenty-four] successful drug screens. … In addition to positive drug screens and poor attendance at parenting [classes], he failed to implement the parenting curriculum and failed to provide structure for [Children].

At the April 29, 2024, review hearing, it was deemed that [Father was minimally compliant with the permanency plan]. … Father attended eight to [twelve] weeks of parenting instruction. … He was charged with robbery for an incident that occurred on February 7, 2024. He failed to submit to a majority of the attempted drug screens. Father's visitation was suspended for missed parenting sessions. He failed to undergo a psychological evaluation and maintain contact with the caseworker. Both

- 2 -

Mother and Father made minimum progress towards alleviating the circumstances which necessitated placement. Mother and Father also failed to attend the two family group decision meetings that were held.

On December 2, 2024, the dependency court found that aggravated circumstances existed as to Mother and Father for failing to maintain substantial and continuing contact with Children for a period of at least six months, as the last visit Parents had with Children was more than 14 months prior on September 18, 2023. The court ordered that no additional efforts were to be made to preserve the family or reunify Children with Parents.

At the third review hearing on January 2, 2025, … Father had no compliance with the plan. He failed to maintain contact with the Agency and did not participate in drug screens or parenting instruction. He also failed to attend two scheduled mental health assessments. … Father made no progress towards alleviating the circumstances requiring placement. The dependency court also ordered that Parents' visits with Children be suspended because they posed a grave threat to the mental wellbeing of Children.

Petitions for involuntary termination of parental rights were filed against Father and Mother on August 23, 2024. The Agency aver[red] that the parental rights of both Father and Mother should be terminated pursuant to section 2511(a), subsections (2), (5) and (8) of the Adoption Act … and that the developmental, physical and emotional needs of … Children will be best met by terminating the parental rights of Mother and Father pursuant to section 2511(b). An initial fast track hearing was scheduled for October 16, 2024. The October 16th hearing was continued to December 11, 2024, for lack of service on Father due to his whereabouts being unknown. Father and Mother appeared at the December 11th fast track hearing and stated their intent to contest the involuntary termination. Evidentiary hearings were then held March 13, 2025, March 27, 2025 and May 5, 2025.

Orphans' Court Opinion, 7/16/2025, at 1-4 (unnecessary capitalization and typographical errors omitted).[1]

On July 16, 2025, the orphans' court entered orders terminating the parental rights of Father and Mother. Father filed timely notices of appeal from the orders.[2] Both Father and the orphans' court complied with Pennsylvania Rule of Appellate Procedure 1925. Father raises the following issues for our review:

> 1. Whether the [orphans' court] erred in finding by clear and convincing evidence that the moving party met its burden as to terminating the parental rights of [Father] pursuant to 23 Pa.C.S.[] § 2511(a)(2).
>
> 2. Whether the [orphans' court] erred in finding by clear and convincing evidence that the moving party met its burden as to terminating the parental rights of [Father] pursuant to 23 Pa.C.S.[] § 2511(a)(5).
>
> 3. Whether the [orphans' court] erred in finding by clear and convincing evidence that the moving party met its burden as to terminating the parental rights of [Father] pursuant to 23 Pa.C.S.[] § 2511(a)(8).
>
> 4. Whether the [orphans' court] erred in finding by clear and convincing evidence that the moving party met its burden as to terminating the parental rights of [Father] pursuant to 23 Pa.C.S. § 2511(b).

_____

[1] We note that the orphans' court appointed Attorney Richard J. Baumgardner as Guardian ad Litem and counsel for Children. Orphans' Court Opinion, 7/16/2025, at 1. The court found that Attorney Baumgardner could represent both the legal and bests interests of Children without conflict. **See id.**; **see also** N.T., 3/13/2025, at 4.

[2] Mother also appealed the termination of her parental rights. Her appeals are separately pending before this Court.

Father's Brief at 4.

Father challenges the termination of his parental rights. In reviewing an appeal from an order terminating parental rights, we adhere to the following standard:

> In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. This standard of review corresponds to the standard employed in dependency cases, and requires appellate courts to accept the findings of fact and credibility determinations of the [orphans'] court if they are supported by the record, but it does not require the appellate court to accept the [orphans'] court's inferences or conclusions of law. That is, if the factual findings are supported, we must determine whether the [orphans'] court made an error of law or abused its discretion. An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion; we reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will. Thus, absent an abuse of discretion, an error of law, or insufficient evidentiary support for the [orphans'] court's decision, the decree must stand. We have previously emphasized our deference to [orphans'] courts that often have first-hand observations of the parties spanning multiple hearings. However, we must employ a broad, comprehensive review of the record in order to determine whether the [orphans'] court's decision is supported by competent evidence.

*In re Adoption of C.M.*, 255 A.3d 343, 358-59 (Pa. 2021) (quotation marks, brackets, and citations omitted).

Termination of parental rights is governed by 23 Pa.C.S. § 2511, which requires a bifurcated analysis. *See id.* at 359. "Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds

for termination delineated in section 2511(a)." *In re C.M.K.*, 203 A.3d 258, 261-62 (Pa. Super. 2019) (citation omitted). If the orphans' court determines the petitioner established grounds for termination under section 2511(a) by clear and convincing evidence, the court then must assess the petition under subsection 2511(b), which focuses on the child's needs and welfare. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). Clear and convincing evidence is evidence that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa. Super. 2000) (en banc) (quotation marks and citations omitted).

As stated above, the orphans' court terminated Father's rights to Children pursuant to section 2511(a)(2), (5), and (8). "This Court may affirm the [orphans'] court's decision regarding the termination of parental rights with regard to any one subsection of [s]ection 2511(a)." *In re J.F.M.*, 71 A.3d 989, 992 (Pa. Super. 2013). We focus our analysis on section 2511(a)(8).

Father argues that the orphans' court abused its discretion by terminating his parental rights pursuant to section 2511(a)(8). Father's Brief at 10. He asserts that the conditions that led to Children's removal do not continue to exist as he has "actively engaged in drug treatment and continues to do so." *Id.*

To terminate parental rights under section 2511(a)(8), the petitioner must prove: (1) the child has been removed from parental care for twelve months or more; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child. **In re K.Z.S.**, 946 A.2d 753, 759 (Pa. Super. 2008); **see also** 23 Pa.C.S. § 2511(a)(8). Notably, this subsection "does not require the court to evaluate a parent's willingness or ability to remedy the conditions that led to the placement of the child[]." **Interest of M.E.**, 283 A.3d 820, 832 (Pa. Super. 2022). Rather, "the relevant inquiry regarding the second prong of [section] 2511(a)(8) is whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing." **Id.** (quotation marks and brackets omitted). Further, "[w]ith respect to any petition filed pursuant to subsection [(a)(8)], the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S. § 2511(b); **see also T.S.M.**, 71 A.3d at 255 n.8.

The orphans' court provided the following explanation for its decision to terminate Father's parental rights under section 2511(a)(8):

> Children were removed from Parents' care by the Agency on March 23, 2023, due to drug use. The Agency filed the involuntary termination petitions on August 23, 2024, which was 17 months after Children had been placed in agency custody.

This [c]ourt finds that the concern for Parents' drug use and addiction continues to exist. While the [c]ourt understands that addiction recovery is a lifelong process, neither Parent has established a sufficient period of sobriety to alleviate that concern. Section 2511(b) prohibits this Court from taking into consideration efforts initiated by a parent after the parent has received notice of the termination petition. The termination petition against Father was served by publication on November 17, 2024[.] … Therefore, Father's current outpatient treatment is disregarded for purposes of determining whether the concern for Father's drug use still exists. Even if this [c]ourt were able to consider Parents' current drug treatment, doing so would not overcome the fact that the concern for Parent's drug use continues to exist. Parents have had several failed recovery attempts. Father's compliance with his current treatment is unknown. … These facts alone establish that Parents are actively recovering from drug addiction and that risk of relapse is a legitimate concern.

Orphans' Court Opinion, 7/16/2025, at 18-19.

The record reflects that Children have been removed from Father's care for more than twelve months, as they were removed on March 23, 2023. N.T., 5/5/2025, at 4. With respect to Father's drug use, the record reflects that throughout the life of the dependency case, he had numerous positive drug tests or otherwise failed to participate in drug screens. *See* N.T., 3/13/2025, at 82-83. Angelina Poole ("Poole"), Children's caseworker at the Agency, testified that although he successfully completed an inpatient stay at a drug and alcohol treatment facility, she was unable to verify that Father received additional drug and alcohol treatment after his discharge facility on May 15, 2023. N.T., 5/5/2025, at 22-23. Poole stated that Father's compliance with the permanency plan was typically "no compliance, no progress," or "minimal compliance, minimal progress," and that he never made more than minimal

progress alleviating the reasons for removal of the Children from his care—namely, his battle with drug abuse. *Id.* at 35-40. Poole further stated that the circumstances leading to removal of Children continue to exist, as the Agency still had concerns regarding Father's drug and alcohol abuse. *Id.* at 38-40.

Although Father testified that he completed several inpatient and outpatient treatment programs, he never provided the Agency with proof that he completed any program other than the initial inpatient treatment immediately following Children's removal prior to the filing of the termination petition nor did his testimony indicate whether those programs addressed drug and alcohol abuse. *Id.* at 100-01, 104, 113. Father testified that he is currently in outpatient therapy, but it was unclear from his testimony whether that therapy focused on drug and alcohol rehabilitation. Father also was unable to provide the court with his exact "clean date," but did claim that he has been sober since April 2024. *Id.* at 101, 113.

Jean DeFilippis ("DeFilippis") from ARCpoint Labs testified that ARCpoint contracted with Westmoreland County to provide drug testing of parents both before and after Children's removal from Parents' care. *See* N.T., 3/13/2025, at 74-75. With respect to Father's drug screens, DeFilippis stated that ARCpoint unsuccessfully attempted to contact Father for drug testing 217 times, and that he refused testing on another 4 occasions. *Id.* at 82. Father had twenty-four successful drug screens, and of those screens he tested

positive five times for fentanyl and codeine and ten times for marijuana (and he does not possess a medical marijuana card). *Id.* at 82-83. On October 11, 2023, the date of his last positive drug screen, Father tested positive for buprenorphine, norbuprenorphine, fentanyl, codeine, and marijuana. *Id.* at 83. DeFilippis explained that Father did not undergo any further drug screens after that date because he was in prison and his whereabouts were unknown after his release from prison. *See id.* at 86-87.

Thus, the record supports a finding that Father has largely not addressed, let alone remedied, the concerns that resulted in Children's removal from his care. The orphans' court therefore did not err in finding clear and convincing evidence to satisfy termination under the first two prongs of section 2511(a)(8).

We next consider whether the record supports the orphans' court's conclusion that there was clear and convincing evidence to terminate Father's rights pursuant to the third prong of section 2511(a)(8) and section 2511(b). *See In re Adoption of G.W.*, 342 A.3d 68, 89 n.20 (Pa. Super. 2025) (en banc) (explaining that courts regularly conduct the needs and welfare analyses required by both the third prong of section 2511(a)(8) and section 2511(b) together using the same evidence).

Father argues that the orphans' court abused its discretion by determining that termination of his rights would best serve the developmental, physical, and emotional needs and welfare of Children. Father's Brief at 11.

He acknowledges that the hearing contained "testimony of a good relationship between [Children] and their respective foster parents," but asserts that there was no evidence "to establish that terminating Father's parental rights would serve [Children's] developmental, physical and emotional needs and welfare." *Id.* Father contends that the only evidence presented as to the lack of a bond between Children and Father "was based on the fact that Father had not been involved for a period of time due to his personal barriers." *Id.*

Section 2511(b) provides:

The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S. § 2511(b).

"[T]he determination of the child's needs and welfare requires consideration of the emotional bonds between the parent and child. The utmost attention should be paid to discerning the effect on the child of permanently severing the parental bond." *T.S.M.*, 71 A.3d at 267 (quotation marks omitted). Our Supreme Court has explained, however, that "the parental bond is but one part of the overall subsection (b) analysis[.]" *Interest of K.T.*, 296 A.3d 1085, 1113 (Pa. 2023). The needs and welfare analysis must also include the consideration of factors such as: "the child's need for permanency and length of time in foster care …; whether the child is in a preadoptive home and bonded with foster parents; and whether the foster

- 11 -

home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability." ***Id.*** (citations omitted). "These factors and others properly guide the court's analysis of the child's welfare and all [their] developmental, physical, and emotional needs." ***Id.*** Importantly, "[orphans'] courts have the discretion to place appropriate weight on each factor present in the record before making a decision regarding termination that best serves the child's specific needs." ***Id.***

With respect to its needs and welfare analysis, the orphans' court explained:

> This [c]ourt finds that termination of parental rights is in the best interest of Children and will serve all of their needs and general welfare. Ms. Clair testified that when visits were occurring, Children would be excited to see Parents at the beginning and were upset when the visits ended. However, the last visit occurred in September 2023. The inconsistent attendance by Parents at visits proved difficult for Children. Dr. O'Malley testified that Children both acknowledged that Parents were unable to care for them and that they both view their respective foster mothers as their actual [parents].
>
> Additionally, overwhelming evidence established that Children have strong bonds to their foster mothers. Children are doing extremely well in their care. Dr. Mahady and Ms. McKoy testified regarding the progress they have made while being placed with the foster mothers. The foster mothers have been able to implement practices that assist Children with the therapeutic treatment. Dr. O'Malley, Dr. Mahady and Ms. McKoy all testified that removal of Children from their foster mothers could result a significant setback in their treatment which could have a lifelong effect on their ability to form attachments. This [c]ourt unequivocally finds that the Agency has established by clear and convincing evidence that termination of the parental rights of Father and Mother for adoption by the foster mothers

- 12 -

best serves the developmental, physical, and emotional needs of Children.

Orphans' Court Opinion, 7/16/2025, at 20.

The record reveals that to the extent any bond exists between Children and Father, it is not a healthy bond that is beneficial to Children. *See* N.T., 3/13/2025, at 120. After Children's removal from Parents' care, Father only attended eight of twenty-one supervised visits with Children. *Id.* at 171. Jena Clair ("Clair") of UPMC Western Behavioral Health at Mon Yough, who supervised Father's visits with Children and provided Parents with parenting instruction, testified that although Children were excited to see Father at the beginning of visits, the inconsistent visitation by Father was difficult for Children, as Children became concerned for his wellbeing when he missed visits and had behavioral issues at home and at school if he missed visits. *Id.* at 137-38, 147-48, 159-60. Clair explained,

> "[Children] really struggled with transitions at the end of visits. Separating was difficult, and this was exacerbated when there were long gaps between visits. At the beginning of visits, when [Parents] were late, which was fairly often, [Children] would appear to have anxiety, expressed fear that their parents were hurt or not coming. They were concerned for their overall wellbeing.

*Id.* at 147.

Additionally, Dr. Richelle O'Malley testified that when she began providing therapy for C.R.B. in January 2024, she was defiant, aggressive, struggled to listen, and made statements regarding how her parents were unable to take care of her. *Id.* at 99-100, 102-03. She also exhibited

- 13 -

"disinhibited engagement," a condition where C.R.B. would engage in inappropriate attention-seeking behavior, as she interacted with anyone just to get attention and possessed no fear of strangers, which raised several safety concerns. *Id.* at 106. Dr. O'Malley reported that after approximately a year of working with C.R.B. and her foster mother, she noticed that C.R.B.'s behavior was far more appropriate and controlled. *Id.* at 107. Dr. O'Malley testified that in January 2025, she performed a bonding analysis on C.R.B. and her foster mother and noted that C.R.B. was strongly bonded to her foster parent, the two exhibited spontaneous displays of affection, C.R.B. referred to her foster mother as "mom" or "mommy," and C.R.B. "looked to foster mother as a secure base." *Id.* at 104-05, 107. Consequently, Dr. O'Malley's conclusion was that foster mother was the most appropriate permanency option for C.R.B. *Id.* at 107. Dr. O'Malley further opined that if C.R.B. were removed from her foster mother's care, it would cause C.R.B. substantial long-term damage and inhibit her ability to form secure attachments. *Id.* at 107-08. Dr. O'Mally stated that reunification with Father would "take quite a bit of work," as he would have to demonstrate his sobriety, remain sober and stabilized, and then complete the appropriate "attachment work," resulting in "an extended process." *Id.* at 108.

Dr. Christine Mahady, who provided complex trauma therapy to C.R.B., echoed Dr. O'Malley's testimony. *See* N.T., 3/27/2025, at 45-46. Dr. Mahady explained that when she began working with C.R.B. her behavior was "feral,"

as the child was distrustful of authority figures, struggled with listening, had severe tantrums, and could not remain calm. *Id.* at 56. After working with C.R.B. and her foster mother for a time, Dr. Mahady reported that C.R.B. was stabilizing and doing "exceedingly well" at listening to adult instruction and calming herself. *Id.* at 60. Thus, Dr. Mahady opined that C.R.B. resuming visits with Father would threaten both C.R.B.'s progress and mental well-being. *Id.* at 61-64.

With respect to D.A.B., Dr. O'Malley testified that prior to his placement with his current foster mother, he was often "angry and irritable," but that she noticed a significant improvement, and he expressed "happiness and joy" after he settled in with his current foster mother. N.T., 3/13/2025, at 109-10. Dr. O'Malley indicated that D.A.B. had developed a secure attachment to his foster mother, as he refers to her as "mommy," initiates physical affection with her, and follows her instructions. *Id.* at 111-13, 115-18. She also opined that removal from his foster mother's care would present significant risks to D.A.B. *Id.* at 118-19.

Ashley McKoy ("McKoy"), who provides trauma therapy for D.A.B., testified similarly to Dr. O'Malley. *See* N.T., 3/27/2025, at 8-9. McKoy stated that D.A.B. made significant progress with his foster mother and that reunification or resuming visits with Parents would be extraordinarily risky and potentially counterproductive. *Id.* She also observed that D.A.B. and foster mother shared a "very close" connection and he looked to her for emotional

stability, connection, and reassurance. *Id.* at 16. McKoy opined if D.A.B. were removed from foster mother's care, it would be destabilizing to his emotional well-being and that he would likely return to his aggressive behaviors quickly. *Id.* at 18-19.

Based on the record before us and the standard of review we must employ, we discern no abuse of discretion in the orphans' court's conclusion that Children are bonded to their foster parents, the foster parents best meet their needs and welfare, and that Children will not be irreparably harmed by terminating Father's parental rights. Accordingly, we conclude that the orphans' court did not err in determining that Children's developmental, emotional, and physical needs and welfare are best met by terminating Father's parental rights under the third prong of section 2511(a)(8) and 2511(b).

As the orphans' court's determination pursuant to section 2511(a)(8) and (b) is supported by the record, we must affirm the orders terminating Father's parental rights to Children. *See C.M.*, 255 A.3d at 358-59.

Orders affirmed.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 12/30/2025