J-A11010-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

IN RE: P.A.M., A MINOR

APPEAL OF: A.S., MOTHER

: IN THE SUPERIOR COURT OF
:     PENNSYLVANIA
:
:
:
:
:
:
:
: No. 60 MDA 2026
:

Appeal from the Order Entered November 21, 2025
In the Court of Common Pleas of Berks County Orphans' Court at No(s):
89019

BEFORE:  BECK, J., NEUMAN, J., and BENDER, P.J.E.

MEMORANDUM BY BECK, J.:               **FILED: MAY 11, 2026**

A.S. ("Mother") appeals from the order entered by the Berks County Court of Common Pleas ("orphans' court") granting the petition filed by B.M. ("Father") and terminating her parental rights to P.A.M., born in October 2015 ("Child"), pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (9)(ii), and (b).  Counsel for Mother, Attorney Emily E.B. Cherniack ("Counsel"), has filed a petition to withdraw and brief pursuant to ***Anders v. California***, 386 U.S. 738 (1967), and ***Commonwealth v. Santiago***, 978 A.2d 349 (Pa. 2009).[1]  After review,

---

[1] ***See Interest of R.S.A.D.***, 341 A.3d 787, 794 (Pa. Super. 2025) (recognizing that the ***Anders***/***Santiago*** procedure for court-appointed counsel seeking to withdraw has been extended to appeals involving termination of parental rights).

we grant Counsel's petition to withdraw and affirm the orphans' court's decision.[2]

The orphans' court aptly summarized the facts and circumstances underlying this appeal:

> Child was born to Mother and Father in 2015. Mother and Father resided together for approximately one and a half years after Child was born. In 2017, Father ended the relationship with Mother, who at the time retained primary custody, with Father visiting daily. A temporary custody order in 2019 shifted primary custody to Father, followed by a final custody order reaffirming Father's primary custody in 2021. Father has exercised exclusive physical and legal custody of Child since May 2021.
>
> Child is the only offspring of Mother and Father. Mother had three other children (two older than child and one younger)[; she retains her parental rights only as to the two older children].

_____

[2] Child was represented by a single attorney at the termination hearing, Attorney Mark Zimmer, who represented both her legal interests as counsel and her best interests as her guardian ad litem ("GAL"). Orphans' Court Order, 11/21/2024. The orphans' court found there was no conflict between Child's best and legal interests and that Attorney Zimmer could therefore fulfill both roles. **See** N.T., 10/2/2025, at 3; **see also** Orphans' Court Opinion, 1/30/2026, at 9 ("The orphans' court on multiple occasions, both before (at multiple pretrial conferences) and during the termination hearing, inquired as to the investigation performed by Attorney Zimmer, Child's wishes, and whether those wishes conflicted with Attorney Zimmer's recommendation applying a best interest duty analysis.") (cleaned up). We remind the orphans' court, however, that its conflict determination in this regard should appear in its order of appointment. **See In re Adoption of K.M.G.**, 240 A.3d 1218, 1236 (Pa. 2020) (stating that appellate courts must conduct a sua sponte review to discern "(1) whether the orphans' court appointed counsel to represent the legal interests of the children and (2) if the appointed counsel also serves as GAL, whether the orphans' court determined that the child's best interests and legal interests did not conflict," observing that this can be accomplished "by a review of the orphans' court order (or lack thereof) appointing counsel to represent a child under Section 2313(a)").

Father, who is now married, has a stepson from that relationship, but no other biological children; Mother remains single.

The custodial shift from Mother to Father in 2019 was contemporaneous with Mother's arrest on charges related to the alleged neglect of her youngest child (an infant at the time)— Child's half-sibling. On March 9, 2022, Mother pleaded to a single count of aggravated assault [pursuant to 18 Pa.C.S. § 2702(a)(9)]. On April 18, 2022, the [criminal court] sentenced Mother in an open plea to [thirty] months to seven years in a state correctional institution. [Her sentence prohibited her from having any contact with the victim or unsupervised contact with any child under eighteen.] In April 2025, Mother was paroled to a transitional halfway house.

The controlling final custody order of January 6, 2021 (predating Mother's incarceration) permits Mother only supervised visitation with Child. Although Mother initially participated in supervised visits, she did not participate in visits with Child for approximately one year prior to her incarceration.

### 1. Father's Testimony

Father appeared to be in good health and sound mind when appearing before the orphans' court and testifying. The orphans' court found him to be thoughtful in his answers and credible in whole.

Father recounted the time from when Child was born until the present. He detailed that he met his now wife a few months after breaking up with Mother. Father lives with his wife, her son, and Child. Father testified that Child has a great relationship with her stepmother, and that "they love each other." N.T., 10/2/2025, at 16. Stepmother has expressed that she wishes to adopt Child. Father told the court that his stepson—an eighteen-year-old high school senior—also has a great relationship with Child. *Id.* Father describes the relationship between stepson and Child as a brother-sister bond, indicating that the stepson is protective of Child, helps her with homework, and that the two often joke around with one another. *Id.*

Father testified that Mother's visitations with Child following the final custody order were to either be supervised by Child's maternal grandfather or Signature Family Services ("Signature")[, an organization with offices in several counties that provides, inter

alia, supervision in child custody and dependency matters]. He said Mother took advantage of these visits on an average of once per week but that all visits stopped by May [2021]. *Id.* at 7. Father explained that maternal grandfather no longer wanted to act as a supervisor for visits after recurring conflict with Mother. Father said Mother was also unable to get along with representatives from Signature, whose Berks County office sought to potentially transfer the case to Signature's Schuylkill County location[—approximately thirty-five miles away—]due to difficulty with Mother. *Id.* at 8. Father did not agree with the timing of the request, nor did he think moving the location of the supervised visits would be conducive to Child's best interests with keeping in a routine.

… Father said after Mother was incarcerated in April 2022, she sent Child between eight and ten letters from prison. *Id.* at 14. Father said he gave them to Child and that he would read them to her if she was unable to read any parts of the letters. Child instructed him to throw the letters away. *Id.* Father testified further that he kept some of the letters for child because "he wanted her to have something." When asked if Mother sent child any gifts during this time, Father said the only item that might be a gift was a hand drawn picture sent from Mother. *Id.* at 15. Father testified that he has never received any sort of child support from Mother. *Id.*

Father believes it would be in Child's best interests for Mother's parental rights to be terminated because Mother has not had any contact with Child, and that Child does not want to have any contact with Mother. He also worries for Child's safety in consideration of what Mother has done with her other children. *Id.* at 17. Father also stated Child became scared and depressed upon learning Mother had been released from prison. *Id.* at 21. Child has asked Father to be kept away from Mother and to never have to speak to her again. *Id.*

With reference to a specific traumatic event involving Mother and Child, Father recounted that Child still has bad memories from an incident in 2018 when Mother made false reports to [Berks County Children and Youth Services ("BCCYS")] and Pennsylvania State Police, in which she accused Father of: (a) inappropriately touching Child, (b) giving Child alcohol, and (c) leaving Child unattended in vehicles. *Id.* at 18-20. As part of that incident, Child was forcibly removed from Father's care when

- 4 -

a temporary protection from abuse order was granted upon an ex parte application Mother filed and presented on [C]hild's behalf …. The assigned domestic relations judge ultimately dismissed Mother's protection from abuse petition after a hearing wherein the judge determined there was no basis upon which to grant relief. *Id.* at 19. Father also clarified that he was not indicated by BCCYS or any other agency after investigations into Mother's allegations were completed. *Id.* at 20.

On cross[-]examination, Father admitted that he would not accept phone calls from Mother when she was in prison. *Id.* at 28. Father indicated he was told by the assigned custody judge then assigned to the custody case that he did not have to take Mother's calls. In 2023, while in prison, Mother filed a contempt petition against Father, which the court dismissed a few months later. *Id.* at 32-33. The judge assigned at that time ordered contact to stop and reportedly advised Father of his rights to file for termination of Mother's parental rights. *Id.* at 33.

When asked by the orphans' court, Father said the only person from Mother's family that reached out to him for contact with Child was maternal grandfather. *Id.* at 32. Father said that he permits maternal grandfather to have ongoing contact and visits with Child. Father also clarified, at the orphans' court's request, that Mother did not contact him between May 2021 and April 2022—prior to her incarceration—to speak to or have contact with Child. *Id.* at 32.

### 2. Mother's Testimony

Mother appeared before the orphans' court and testified on her own behalf. The court found Mother's testimony to be largely incredible. Mother caged responses with purpose, appearing to limit any fault she may have had in not pursuing contact with Child. Mother deflected and avoided any opportunity to express contrition for unsavory things said of her in court including the criminal matters for which she had previously accepted responsibility.

Mother maintained that Child told her that Father was inappropriately touching her, so she reported it to BCCYS and the police. *Id.* at 37. She further claimed that she voluntarily chose to drop the temporary protection from abuse petition, denying that there was a merits hearing on the matter. *Id.*

- 5 -

Mother blamed maternal grandfather for her supervised visits with Child ending, saying she did not suggest any other potential family or friend supervisors because she felt Father would not allow it. *Id.* at 28, 38. She further denied having argued with maternal grandfather and says the blame for conflict rest with Father for not making time for maternal grandfather to supervise visits. *Id.* at 52. Similarly, Mother blamed Signature for cutting off her supervised visits arguing this occurred solely because Signature's caseload was too big at the time. *Id.* at 38-39. Mother believes Signature wanted to send her case to another county because of having too much to do, denying it was because of any clashes between her and the staff at the Berks County location.

In opposition to what Father testified, Mother claimed she had a great relationship with Child prior to Mother's incarceration. *Id.* at 40. She said Child would tell her, "I love you mommy. I love you more than anything." *Id.* Also in conflict with Father's testimony, Mother claimed she made repeated and continued attempts to schedule visits with Child by contacting Father prior to going to prison, but that her attempts were rebuffed. *Id.* at 41. Mother also claims to have sent Child thirty or more letters from prison in addition to gifts on all holidays and birthdays. *Id.* As it pertains to this very relevant testimony, the court finds Father credible, whereas Mother's testimony was not credible.

When pressed on why she was in prison, Mother admits it was for aggravated assault on her youngest child. *Id.* at 49. When asked about the specific details of the crime—that the infant was not fed and nearly died—Mother replied, "[t]hat's what the court documentation say (sic)." *Id.* at 50. When further pressed on if that is what the medical evidence showed, Mother replied, "[y]ou could say that." *Id.* Mother did, however, admit that the conditions of her sentence require her to be supervised while around any children under the age of eighteen.

Mother testified that, while in prison, and since being released to a half-way house, she has worked on her mental health, learned coping skills, taken classes, and been prescribed a "right med" that she needed. *Id.* at 44. Mother claims to have received "probably about 40 certificates" indicating she had completed classes during incarceration, including trauma-based coping and parenting skills[, none of which she presented at the hearing]. *Id.* at 44-46.

### 3. Recommendations of Attorney Zimmer and Child's Stated Preference

\*     \*     \*

… The orphans' court heard credible testimony from Father that Child's wishes were to no longer have contact with Mother and to be adopted by Father's wife—facts corroborated by Attorney Zimmer through his own interactions with Child. His recommendations at the time of the termination hearing, as they were prior to that date, [are] consistent with what Child's well-founded and maturely stated preferences. …

Attorney Zimmer indicated that he spoke with Child, Father, Mother, and Child's stepmother.[FN] *Id.* at 63. Attorney Zimmer said that he reviewed the concept of adoption with Child and that Child wanted to be adopted by stepmother. *Id.* at 64. Attorney Zimmer stated that Child has "unfortunate feelings about (Mother)" and that Child is afraid of her. *Id.* at 63-64. Consistent with Father's testimony, Attorney Zimmer stated that Child recalls being forcibly removed from Father's custody, and that is one of the reasons she does not want contact with Mother. *Id.* Attorney Zimmer further corroborated Father's testimony that this incident resulted in Child's desire to not receive/review correspondence from Mother. It was, for these reasons, his recommendation was that the orphans' court terminate Mother's parental rights and free Child for adoption by stepmother.

> [FN] Attorney Zimmer prepared a written report of his discussions/recommendations that he exchanged with counsel for the parties in advance of the termination hearing. Counsel [] objected to his "testimony" on the basis of his report, arguing that Attorney Zimmer was conflating the roles of GAL in custodial and termination contexts. The objection, although noted by the court, proved semantical. Although the court did not receive the prepared written report into the record in support of testimony under examination, Attorney Zimmer was permitted to advance Child's best and legal interests not only by participating in witness examination, but also through [] Attorney Zimmer's prepared statement/argument to the orphans' court setting forth Child's preferences and best interest recommendations. Anything less would require Child's testimony in court under cross-examination—a traumatic

experience for a then-ten-year-old that neither party sought to compel.

Trial Court Opinion, 1/30/2026, at 3-10 (cleaned up).

At the conclusion of the hearing, the orphans' court took the matter under advisement. N.T., 10/2/2025, at 70. It entered its order on November 21, 2025, granting Father's petition and terminating Mother's rights to Child pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (9)(ii), and (b). Mother filed a timely notice of appeal along with her concise statement of errors complained of on appeal. *See* Pa.R.A.P. 1925(a)(2)(i), (b). The orphans' court filed a written opinion in support of its decision pursuant to Rule 1925(a).

When an attorney files an *Anders* brief on appeal, we may not review the merits of any possible issues without first examining counsel's request to withdraw. *In re Adoption of B.G.S.*, 240 A.3d 658, 661 (Pa. Super. 2020). To withdraw pursuant to *Anders*, counsel must "petition the court for leave to withdraw stating that, after making a conscientious examination of the record, counsel has determined that the appeal would be frivolous[.]" *In re J.D.H.*, 171 A.3d 903, 907 (Pa. Super. 2017) (citation omitted). Additionally, counsel must file an *Anders* brief that satisfies the following criteria:

(1) provide a summary of the procedural history and facts, with citations to the record;

(2) refer to anything in the record that counsel believes arguably supports the appeal;

(3) set forth counsel's conclusion that the appeal is frivolous; and

- 8 -

(4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

*B.G.S.*, 240 A.3d at 661 (quoting *Santiago*, 978 A.2d at 361). Counsel also must provide a copy of the *Anders* brief to the client, along with a letter that advises the client of the immediate right to either retain new appellate counsel or proceed pro se, and to "raise any points that the appellant deems worthy of the court's attention in addition to the points raised by counsel in the *Anders* brief." *In re X.J.*, 105 A.3d 1, 4 (Pa. Super. 2014) (citation and brackets omitted).

"Once counsel has satisfied the above requirements, it is then this Court's duty to conduct its own review of the trial court's proceedings and render an independent judgment as to whether the appeal is, in fact, wholly frivolous." *Id.* (citation omitted). Our independent review is not limited to the issues that counsel discussed in the *Anders* brief, but extends to "additional, non-frivolous issues" that counsel may have overlooked. *J.D.H.*, 171 A.3d at 908 (citation omitted). An appeal is frivolous when it "lacks any basis in law or fact." *Santiago*, 978 A.2d at 356 (citation omitted).

Our review of the record and Counsel's brief confirms that Counsel complied with the above requirements. Counsel filed a petition with this Court seeking to withdraw, stating that her conscientious review of the record revealed no non-frivolous issues she could raise on appeal. Petition to Withdraw, 2/23/2026. Counsel attached the letter she sent to Mother, which

included all required information. *See* Letter, 2/26/2026. Counsel's brief is also fully compliant with *Santiago*. *See Anders* Brief at 6-13. We therefore turn our attention to the issues raised in the *Anders* brief:

> A. Whether the orphans' court erred in terminating Mother's parental rights under 23 Pa.C.S. § 2511(a) when Mother was a ready, willing, and able parent following release from incarceration?

> B. Whether the orphans' court erred under 23 Pa.C.S. § 2511(b) because the child shared a parental bond with Mother and termination was not in the child's best interest?

*Id.* at 5 (cleaned up).[3]

The Adoption Act requires courts to engage in a bifurcated process when considering a petition to terminate an individual's parental rights. "Courts must begin by first considering whether a parent's conduct warrants termination under section 2511(a) prior to shifting its focus to whether termination best serves the child's needs and welfare." *In re Adoption of G.W.*, 342 A.3d 68, 82–84 (Pa. Super. 2025) (en banc). The petitioner only needs to prove one ground under subsection (a) to shift the focus to section 2511(b), which requires the court to determine whether termination serves the child's developmental, physical, and emotional needs and welfare. *In re K.R.*, 200 A.3d 969, 979 (Pa. Super. 2018) (en banc). The party seeking termination must prove the elements of section 2511 by clear and convincing

---

[3] Mother has not filed a brief through new counsel or pro se. Attorney Zimmer also did not file a brief on behalf of Child.

evidence, which is evidence that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***Matter of Adoption of L.C.J.W.***, 311 A.3d 41, 48-49 (Pa. Super. 2024).

We adhere to the following standard when reviewing a juvenile court's decision to terminate parental rights involuntarily:

> In cases concerning the involuntary termination of parental rights appellate review is limited to a determination of whether the [order] of the termination court is supported by competent evidence. This standard of review corresponds to the standard employed in dependency cases, and requires appellate courts to accept the findings of fact and credibility determinations of the orphans' court if they are supported by the record, but it does not require the appellate court to accept the orphans' court's inferences or conclusions of law. That is, if the factual findings are supported, we must determine whether the orphans' court made an error of law or abused its discretion. An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion; we reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will.

***In re Adoption of C.M.***, 255 A.3d 343, 358-59 (Pa. 2021) (quotation marks, brackets, and citations omitted); *see also* ***Interest of S.K.L.R.***, 256 A.3d 1108, 1129 (Pa. 2021) ("Because orphans' courts are on the front lines assessing the credibility of witnesses and weighing competing and often challenging evidence, it is paramount that, in reviewing orphans' courts' decisions in this arena, appellate courts defer to orphans' courts' first-hand observations as they relate to factual determinations.").

This Court may affirm the juvenile court's decision to terminate parental rights pursuant to any one subsection of section 2511(a), as well as subsection (b). **In re J.F.M.**, 71 A.3d 989, 992 (Pa. Super. 2013). As such, we focus our analysis on sections 2511(a)(9)(ii) and (b) of the Adoption Act.

Pursuant to section 2511(a)(9)(ii), parental rights may be terminated if the parent has been convicted of felony aggravated assault and the victim was the parent's child. 23 Pa.C.S. § 2511(a)(9)(ii). "By its plain language, the Adoption Act only requires the petitioner to introduce proof of the parent's conviction[.]" **Interest of M.E.**, 283 A.3d 820, 831 (Pa. Super. 2022) (emphasis omitted).

The record reflects that Mother was convicted of aggravated assault for nearly starving her infant child to death. **See** N.T., 10/2/2025, at 11, 49-50. Her conviction for aggravated assault was a first-degree felony. **See** 18 Pa.C.S. § 2702(a)(9) (defining aggravated assault as an "attempt[] to cause or intentionally, knowingly, or recklessly caus[ing] serious bodily injury to a child less than 13 years of age, by a person 18 years of age or older"), (b) (defining aggravated assault under subsection (a)(9) as a first-degree felony).

As Mother was convicted of committing felony aggravated assault against her child, the orphans' court found "[s]ection 2511(a)(9)(ii) … is incontrovertibly applicable to this matter," and her conviction alone "is competent evidence to establish grounds to terminate parental rights." Orphans' Court Opinion, 1/30/2026, at 11 (citation omitted).

Counsel recognizes that the statutory elements of section 2511(a)(9)(ii) were satisfied, rendering any claim of error as to the sufficiency of the evidence to be frivolous. *Anders* Brief at 10. We agree; there is no basis in the record before us to find error in the orphans' court's determination under this provision.

Turning to subsection (b), we next examine whether the decision to terminate Mother's parental rights was inconsistent with Child's needs and welfare. Section 2511(b) provides in relevant part:

> The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S. § 2511(b).

Our analysis focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). "[T]he determination of the child's needs and welfare requires consideration of the emotional bonds between the parent and child. The utmost attention should be paid to discerning the effect on the child of permanently severing the parental bond." *Id.* (quotation marks omitted). It is not enough that there exists a bond between parent and child to avoid termination. *Interest of K.T.*, 296 A.3d 1085, 1109 (Pa. 2023). Rather, the orphans' court must determine whether the bond is "necessary and beneficial" to the child, such that "maintaining the

bond serves the child's developmental, physical, and emotional needs and welfare." *Id.* at 1105-06. Focusing upon the "child's development, and mental and emotional health," the orphans' court should assess whether severing the bond "is the kind of loss that would predictably cause extreme emotional consequences or significant, irreparable harm" to the child. *Id.* at 1110-11.

Additionally, "the parental bond is but one part of the overall subsection (b) analysis[.]" *Id.* at 1113. The needs and welfare analysis must also include, in relevant part, the consideration of factors such as: "the child's need for permanency … and whether the [adoptive parent] meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability." *Id.* (citations omitted). "These factors and others properly guide the court's analysis of the child's welfare and all [their] developmental, physical, and emotional needs." *Id.* A court must examine the matter from the child's perspective, placing the child's needs "above concerns for the parent." *Id.* at 1105.

In reaching its decision that termination of Mother's rights best serves Child's needs and welfare, the orphans' court stated the following:

> The orphans' court found by clear and convincing evidence that Child's best interests would be served in terminating Mother's parental rights so that Child can be adopted by her stepmother, as is Child's desire. Additionally, Child remains in fear of Mother due to chaos Mother injected into Child's life during those times she wanted to assert control; not the least of which included resulted in Child being forcibly removed from Father's care due to

unsubstantiated and incredible accusations made by Mother claiming that Father abused Child.

\*　　\*　　\*

... In the matter at hand, the Court heard credible testimony that Child does not have a bond with Mother—at least a positive, nourishing bond. When faced with the prospect of seeing Mother again, Child became fearful and depressed. Child has expressed to more than one adult a desire to never see Mother again. Child does not even want to read or retain correspondence from Mother. None of these facts leads a rational factfinder to the conclusion that a bond is present, or that Child wishes to maintain attachment.

Indeed, Child has found positive familial bounds in Mother's absence. Child is bonded with stepmother and stepbrother. It is apparent Child feels safe and loved in the home Child shares with Father, stepmother, and stepbrother. The mere specter of Mother returning has damaged Child's feeling of safety and robbed her of some happiness.

Orphans' Court Opinion, 1/30/2026, at 14-15 (cleaned up).

Counsel recognizes, based on the orphans' court's credibility determinations and the testimony presented, that any contention that termination does not serve Child's needs and welfare would be frivolous. **Anders** Brief at 12. Again, we agree with this conclusion.

The record fully supports the orphans' court's findings of fact under subsection (b). There was ample testimony about Child thriving in Father's care and her close bond with both her stepmother and stepbrother. **See** N.T., 10/2/2025, at 16-17, 64. Child is afraid of Mother, based both upon her treatment of Child's infant half-sister and Mother's false reports to BCCYS and police that resulted in Child's forcible removal from Father's care. **Id.** at 18-

20, 63. Father testified that she became depressed and worried upon learning of Mother's release from incarceration. *Id.* at 21. Child has not seen Mother since 2021 and is unwilling to see, speak, or even read letters she received from her. *Id.* at 14, 17, 21, 29, 64.

Attorney Zimmer reportedly spoke with Child about termination of parental rights and adoption and found that she fully understands both concepts. *Id.* at 64. As stated by Father, Child is "hoping that this all comes to an end so she can be at peace, too." *Id.* at 21; *see also id.* at 64 (Attorney Zimmer reporting that Child clearly expressed that she "wants her mother's parental rights to be terminated [and] wants to be adopted by her stepmother").

It is clear that, to the extent any bond between Mother and Child exists, it is neither necessary nor beneficial. Child has close familial associations with Father's wife and her son, and has clearly and unambiguously expressed her informed desire not to see Mother and to be adopted by her stepmother. As the trial court found Father's testimony to be credible and supported by Child's stated preference as communicated by Attorney Zimmer, there is no basis to reverse the trial court's decision that termination of Mother's rights best serves Child's needs and welfare.

We find no abuse of discretion in the orphans' court's decision to terminate Mother's parental rights to Child pursuant to 23 Pa.C.S. § 2511(a)(9)(ii) and (b). Following our independent review of the record, we

further agree with Counsel's conclusion that there are no non-frivolous issues that could be raised on appeal.

Order affirmed. Petition to withdraw granted. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 5/11/2026